In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-3800

CNH INDUSTRIAL AMERICA LLC,

*Plaintiff-Appellee,*

*v.*

JONES LANG LASALLE AMERICAS, INC.,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:15-cv-00981-JPS — **J. P. Stadtmueller**, *Judge.*

ARGUED SEPTEMBER 13, 2017 — DECIDED FEBRUARY 15, 2018

Before BAUER, ROVNER, and SYKES, *Circuit Judges*.

ROVNER, *Circuit Judge.* CNH Industrial America LLC ("CNH"), which manufactures farming and construction machinery (including tractors, combines, backhoes, and the like) under the New Holland brand name, hired the global real estate services firm Jones Lang LaSalle America, Inc. ("JLL") to manage a corporate re-branding program that involved the

replacement of signage at each of CNH's more than 1,400 dealers in North America. The program ran into problems when it was discovered that the vinyl used in the new signs was defective, necessitating the re-manufacture and replacement of virtually all of the signs already installed. After the vinyl manufacturer walked away from its commitment to replace, at its own cost, the defective signs, CNH sued JLL for breach of the service agreement between the two firms. CNH alleged that JLL had failed to perform adequate quality control in the manufacturing of the signs, failed to negotiate the best possible warranty on the vinyl and the signs themselves, and failed to properly document and manage the warranties. Following a bench trial, the district court agreed that JLL had indeed breached its contractual obligations to CNH and that CNH had suffered damages in the amount of $5,482,735. Pursuant to the contract's terms, the court reduced JLL's liability to $3,026.361.60—the sum CNH had paid to JLL in project management fees—plus such other amounts as JLL might recover from third parties (including the vinyl manufacturer and the sign fabricators) in the future. JLL appeals, and we affirm the judgment in all respects.

## I.

In 2007, CNH's global parent—the Italian automaker Fiat—decided that the New Holland brand needed updating. It commissioned a team to create a new logo and prototype dealer sign, and then it directed CNH to implement a re-branding program pursuant to which all of the signage at each of CNH's 1,442 independent dealerships in North America would be replaced. The typical dealer would require a family of five signs, including a pylon sign mounted on a large pole,

a dealership name sign, an outdoor wall-mounted logo sign, a "parts" sign, and a "service" sign. CNH was to hire one or more American sign manufacturers to adapt the prototype and build the dealer signs to American specifications. Given the logistics entailed in replacing the signs at over 1,400 dealers (including site surveys, landlord approval, obtaining the requisite permits from governmental entities, manufacturing and installing the new signs, and disposing of the old signs), CNH decided to hire another firm to manage the process.

CNH chose JLL to manage the sign-replacement program. JLL is a commercial real estate services firm that offers a wide array of services to property owners and investors. JLL represented that it had precisely what CNH was looking for: experience with large-scale signage replacement programs and the ability to provide "turnkey" management of all aspects of the re-branding program. CNH and JLL entered into a Service Agreement in April 2008.

JLL's obligations under the agreement—set forth in a Statement of Work attached thereto—were comprehensive, consistent with its role as the manager of the re-branding program. It was to develop specifications for the signs, identify and recommend to CNH for approval a firm or firms to manufacture the new signs, do the same with respect to raw materials suppliers for the sign components, supervise the manufacturing process, coordinate the entire replacement process with dealers from beginning to end, and handle any complaints from dealers about installed signs. Four of the obligations that JLL expressly assumed under the Service Agreement are particularly relevant here: (1) the obligation to "negotiat[e] … the best possible Warranty Program for the

Family of Signs manufactured and disclose all elements of [the] Warranty Program to CNH and Dealers"; (2) "research and document[ ] … warranty information for all raw materials and sub components"; (3) "provide ongoing Project Management services for Warranty within One[ ]Year from the date of installation" for each sign; and (4) take "direct control and responsibility of all manufacturing including quality control meeting all [JLL] and CNH expectations." Ex. 1002 Attach. B § 1(B) ¶4; § 1(C) ¶1; § 2(C) ¶¶ 1, 2. CNH retained the authority to control the sign-replacement project and approve or reject JLL's recommendations, but it is clear from the agreement that JLL was assuming the burden of managing the project. And the testimony of CNH's witnesses leave no doubt that CNH, consistent with JLL's presentation materials, viewed JLL as the expert in this area and deferred to it as such.

In order to reduce shipping costs, three different sign manufacturers at diverse locations around the country were chosen to produce the new signs. JLL signed the manufacturing contracts on CNH's behalf, so that the multitude of invoices on the manufactured signs would be directed to JLL and it could make payment and resolve any disputes that arose. The agreements took effect on June 17, 2008. The contracts were identical to one another and contained the same warranties on the manufactured signs: a one-year warranty on parts, labor, and workmanship. The one-year warranty period constituted a reduction from the three-year period originally proposed. CNH was keenly interested in "value engineering" that would reduce the costs of the re-branding program to itself and its dealers, and toward that end it accepted a shorter

warranty period in exchange for lower costs on the new signage.

CNH required its dealers to pay for three of the five new signs to be installed at each dealership; CNH paid for the remaining two. Dealers expressed displeasure about the cost of the new signs—$10,500 for the three dealer-owned signs. In response to those concerns, dealers were given the option to finance their sign purchases; they were also given the option to make their own arrangements to install their signs, which would reduce their cost to $7,000. However, self-installation would nullify the one-year warranty on the signs—a nullification that the district court understood to be limited to problems associated with the installation as opposed to defects in the components of the signs.

Upon JLL's recommendation, Arlon, Inc. ("Arlon") was selected as the exclusive supplier of the vinyl used to manufacture the new signs. The design specifications called for the New Holland signs to be fabricated using two custom-formulated colors: blue and yellow. The presentation materials Arlon had submitted in support of its successful proposal to CNH and JLL included details about the warranties Arlon offered on its products. Arlon's standard warranty provided for replacement of the vinyl only (as opposed to labor, shipping, and other costs) on a prorated basis for a period of seven years. Distinct warranty terms were specified for Arlon's Flexface®FX vinyl substrate, a product that JLL and CNH rejected in favor of Arlon's translucent vinyl, which the sign manufacturers would apply to acrylic, heat, and then mold to create the sign faces. Arlon's materials compared its standard warranties to those of its leading competitor, 3M, to demonstrate that Arlon's

warranties were superior in all respects. Custom warranties
were also available on Arlon's products.

JLL accepted the warranty terms that Arlon proposed
without, so far as the record reveals, attempting to negotiate
terms that were more favorable to CNH. (Arlon's representa-
tive would later testify that he was aware of no negotiations
over the terms, and the JLL employee who was the project
manager at the time believed he discussed the warranty with
Arlon but could not recall any specifics.) As we will discuss
below, there is some real question as to what the actual
warranty terms were. The only evidence of the warranty that
either party has been able to identify is a brief summary of the
terms that was included in an exhibit attached to each of the
sign-manufacturing contracts. Arlon has disclaimed authorship
of that summary and has disputed its accuracy; for its part, JLL
does not know who drafted it. The summary states in full:

> Arlon Vinyl Extended Warranty—7 year warranty
> on 1st surface. 2nd surface on exterior sign applica-
> tions is 9 years. These [*sic*] is no charge for
> parts/labor/shipping for 1-year from date of installa-
> tion.

Ex. 52 & Ex. E-Warranty thereto. The reference to the one-year
period during which there would be no charge for parts, labor,
or shipping evidently was a reference to the sign manufactur-
ers' warranty on the completed signs rather than the warranty
on the Arlon vinyl. The reference to the Arlon warranty itself
is incomplete. Arlon's presentation materials indicated that it
would replace defective vinyl on a pro-rated basis tied to the
number of months remaining in the seven-year term; and JLL

understands this to be a materials-only warranty that excluded coverage for labor and other costs. But, again, there is no document in the record that actually sets out the agreed-upon terms of the Arlon warranty.

As manufacturing of the signs commenced late in 2008, problems soon emerged with the Arlon vinyl. In December 2008, one of the sign fabricators reported that the yellow vinyl being used in the two-color CNH signs failed during the manufacturing process—the vinyl showed signs of bubbling and tearing. JLL reported the problem to CNH and worked with the sign manufacturers and Arlon to identify the source of the problem. The vinyl was determined to be defective, and Arlon agreed to replace the defective run of vinyl and reimburse the sign manufacturers for their expenses. The replacement vinyl supplied by Arlon was stress-tested by the manufacturers, and signs fabricated with the new vinyl came off the assembly line free of noticeable defects. JLL did not arrange for any independent testing of the vinyl to confirm that it was free of defects, nor did it demand that Arlon supplement its original warranty with any written assurance that it would take care of future problems with the vinyl at its expense.

A second manufacturing problem occurred sometime after this incident and before 2010 as the result of a discrete run of vinyl that had not been properly cured. When the sign manufacturers reported the problem, Arlon tested and reformulated the vinyl, and the problem appeared to be solved.

The more serious problem with the vinyl—and the one that gave rise to this suit—first emerged in late 2010 or early 2011, as dealers began to report that blue vinyl on the signs which

had been installed on their premises was showing signs of cracking and peeling. By the fall of 2011, some twenty-three installed signs had been reported as defective. That number would increase substantially through the remainder of the year and into 2012 as dealers continued to notice problems with the signs.

In October 2011, Arlon agreed to cover the expense of replacing any and all signs that failed due to problems with its vinyl. This agreement significantly improved upon Arlon's warranty, as it was not limited to replacing the defective vinyl but covered the full cost (including parts and labor) of manufacturing and installing replacements for the defective signs. So far as the record reveals, however, Arlon never memorialized that agreement by way of an amended warranty or other formal instrument; and as problems with the vinyl continued to mount, Arlon would eventually walk away from its commitment to replace the defective signs.

At no time did the parties undertake any form of audit or inventory to determine how many signs in the field might be failing; they instead chose to passively wait for dealers to notice and report failures to CNH and JLL and ask the sign manufacturers and Arlon to address them at that time. The parties agree that the possibility of such an audit was discussed, but they disagree as to who proposed it and who was responsible for rejecting it. JLL insists that it suggested the possibility of both a field survey of all signs that were installed in 2008 and 2009 or, alternatively, a telephonic survey of dealers, but that CNH rejected both options in favor of what JLL labels the "break and fix" approach in order to keep the rebranding program on schedule. CNH disputes that account

and contends that *it* raised the possibility of an audit, but that JLL assured CNH an audit was unnecessary given Arlon's commitment to replace any and all defective signs.

As time wore on, it became clear that the problems with Arlon's vinyl were anything but isolated. Dealers continued to report problems with cracking and peeling signs, and JLL would in turn forward those reports to the sign manufacturers and Arlon so that replacements could be produced. A joint review of the reported vinyl failures by JLL and CNH in January 2014 revealed that approximately 46.7% of the 628 sites where signs had been installed in 2008 and 2009 had failed, and yet Arlon had been able to replace just over half (53.6%) of the defective signs. CNH complained about the delays, and JLL in turn spoke with Arlon about speeding up the replacement process.

Unbeknownst to anyone else, Arlon had determined in early 2012, based on weatherometer testing, that there had been a failure in the formulation of all versions of the custom blue vinyl that it had produced for the CNH re-branding program to that date. Arlon thus had reason to foresee that signs manufactured using that vinyl would continue to fail at a substantial rate. Arlon kept this information to itself. Not until Arlon was required to disclose this information by subpoena in this litigation did the parties become aware of what Arlon had determined years earlier.

Arlon Graphics LLC had acquired the operating assets of Arlon, Inc.'s vinyl manufacturing division late in 2011 and in connection with acquisition agreed to indemnify Arlon, Inc. for any warranty obligations stemming from defective vinyl

products, including the custom vinyl produced for CNH. The new entity—which we shall continue to label "Arlon"—took over the replacement program for the failing New Holland signs.

In 2013 and early 2014, Arlon began to chafe under the burdens of its commitment to replace the failing signs. In 2013, it complained about the prices that the sign manufacturers were charging for replacement signs. It also hired its own sign installer in an effort to reduce costs. Additionally, Arlon prevailed upon JLL and CNH to confine their replacement requests to no more than 10 per month in order to slow the pace of replacements.

Following discussions with JLL in early 2014 about the need to expedite the replacement of defective signs, Arlon evidently decided it had had enough. In May 2014, Arlon informed JLL that it had been replacing signs pursuant to a three-year warranty (set forth in the 2008 presentation materials as the standard warranty on Arlon's Flexface® FX/PSA combination vinyl products, which JLL and CNH had not selected) rather than a seven-year warranty, and that the three-year warranty period had expired. Arlon indicated that it was willing to contribute $3,000 per dealer site toward the ongoing replacement of defective signs, but no more. CNH responded by threatening legal action. In July 2014, Arlon declared that it would cease replacing signs altogether and would no longer communicate with JLL.[1]

_____

[1] CNH filed suit against Arlon in California state court in April 2015. That suit remains pending.

When the bad news from Arlon was reported to CNH, the latter's point person on the project emailed JLL accusing it of mismanaging the situation with Arlon.

> This is beyond disappointing. The process we followed was … put into place by JLL, Arlon & Priority [one of the three sign manufacturers] and was not the process that CNH requested. The order in which signs were repaired was not within CNH control either. There are signs that were reported in 2011 that are still not repaired.
>
> CNH did not let dealers … self report, this was the process we were given to get the warranty covered. I have had numerous conversations over the last year with [the current JLL project manager] about sending a letter to our dealers and asking them [to] check their signs and report them, however, I was assured this was not necessary because Arlon was going to cover the signs via warranty. The information you have provided is the first time I am hearing that they are not willing to cover the replacement of the signs or that there is a limit on what they are going to cover.
>
> We pay JLL to manage our signs. I would have expected the management would include managing this problem and it appears it was not managed properly.

Ex. 135A at 1. The two continued doing business as before, however, until JLL gave CNH notice in February 2016 (approximately six months after CNH commenced this litigation

against JLL) that it was terminating the Service Agreement effective March 31, 2016. Thereafter, CNH made arrangements with one of the three sign manufacturers to replace the sign faces on all of the failed signs, and it engaged 3M to supply the vinyl for the additional replacement signs it required. 3M provided a warranty of up to 9 years on the new vinyl, depending on whether the signs would be installed in the American Southwest, illuminated, or fabricated with additional ultraviolet protection.

CNH filed this suit against JLL in August 2015 alleging that JLL had breached its obligations under the Service Agreement.[2] After a one and one-half day bench trial, the district court found in CNH's favor. The court, in sum, agreed with CNH that JLL had (1) failed to engage in any negotiations with Arlon over the terms of its warranty on the vinyl, thus breaching its obligation to negotiate the best possible warranty on the signs and sign components; (2) failed to research and document Arlon's warranty terms and accurately inform CNH of those terms, instead relying on a warranty summary of unknown provenance and accuracy; (3) breached its duty to exert quality control over the manufacturing process by failing to engage in any sort of independent effort to identify the cause of the failing signs and confirm that Arlon had resolved it; and (4) breached its obligation to provide warranty management

---

[2] JLL in turn filed a third-party complaint against the sign manufacturers, who are contractually responsible for enforcing Arlon's warranty. The manufacturers invoked their right to arbitration and were dismissed from this litigation. The arbitration has been stayed pending the resolution of this appeal.

services within one year of the date of installation of each sign by failing to ensure that warranty claims were presented in a timely manner. In reaching these conclusions, the court adopted CNH's proposed facts where they conflicted with JLL's, and necessarily discredited the testimony of JLL's original project manager on the CNH job as to certain pro-active steps JLL had allegedly suggested to CNH to deal with the problem signs but that CNH had allegedly rejected. The court found that, owing to these contractual breaches, CNH had suffered damages totaling $5,482,735, a figure CNH's damages expert arrived at based on the cost of replacing all defective signs. However, based on a limitation of liability provision in the agreement, the court reduced the damage award to $3,026,361.60, a sum equal to the total amount of fees CNH had paid to JLL over the life of the agreement, plus whatever additional amounts JLL might later recover from the individual sign manufacturers, Arlon, or its own insurance company.

JLL has appealed from the adverse judgment, contesting the district court's rationale in toto.

## II.

A. Subject matter jurisdiction

We begin our review by resolving a belated argument regarding jurisdiction. Subject matter jurisdiction in this case is premised on diversity of citizenship, 28 U.S.C. § 1332, and it is beyond dispute that there is complete diversity of citizenship as between the named parties: CNH is a limited liability company whose sole member, Case New Holland Industrial, Inc. is a Delaware corporation which maintains its principal

place of business in Wisconsin; whereas JLL is a Maryland corporation whose principal place of business is in Illinois. And, of course, CNH's claim for relief surpasses the statutory $75,000 threshold for diversity jurisdiction.

But CNH's suit is founded not only on its own injuries, but on those suffered by 260 Case New Holland dealers who assigned their individual claims to CNH. As we noted in our factual summary, ownership of the dealer signs is divided: the dealers each paid for and own three of the five signs installed at every dealership, and CNH paid for and owns the other two. Before bringing suit, CNH invited all of its 1,442 North American dealers to assign their claims regarding the defective signs to CNH so that it could pursue relief on behalf of the dealers as well as itself. Some 260 dealers did so.

Under the terms of the assignment, each dealer surrendered to CNH "all rights and interest in and to any claims arising out of signs owned by the Dealer … which show cracking or checking in the blue vinyl fields." The dealer acknowledged that, as a result of the assignments, it would "not be a party to negotiations or litigation …, and that counsel for [CNH] will not be acting as counsel for the Dealer." CNH, in turn, undertook to "negotiate or litigate these claims as the owner of the assigned claims … ." It further agreed to pay for the cost of repairing or replacing defective signs "pending a successful resolution of these matters." A successful resolution was defined as "a recovery or settlement value equal to or greater than $8,000 per dealer location." R. 99-1 at 3.

JLL was aware of the assignments below. They were mentioned in CNH's unsuccessful motion for summary

judgment, R. 83 at 17–18, and they were the subject of a motion in limine filed by JLL prior to trial, R. 153. Yet JLL neither raised an objection to the assignments nor took any action consistent with the view that the dealers were the real parties in interest with respect to the assigned claims. It did not, for example, seek to join the dealers as necessary parties pursuant to Federal Rule of Civil Procedure 19(a), nor did it move to dismiss the case pursuant to Rule 19(b) on the ground that the dealers were indispensable parties to the litigation.

On appeal, however, JLL argues for the first time that the dealer assignments to CNH amount to a collusive effort to confer federal jurisdiction over the dealers' claims. Some 16 of the 260 dealers that assigned their claims to CNH are citizens either of Maryland or Illinois and would thus share the same citizenship with JLL. And no dealer has a claim that satisfies the $75,000 threshold. Consequently, the dealers would be unable to sue JLL in federal court in their own right. Yet, in JLL's view, the dealers are the real parties in interest with respect to the claims they have assigned to CNH. The assignments, JLL argues, are in effect a sham, serving the sole purpose of putting dealer claims before the district court despite the fact that those claims fall outside the limited subject matter jurisdiction of the federal courts. *See* 28 U.S.C. § 1359 ("A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of the court."); *Kramer v. Caribbean Mills, Inc.*, 394 U.S. 823, 89 S. Ct. 1487 (1969) (deeming assignment to be collusive for purposes of § 1359 when made to attorney-assignee for $1 and assignee agreed to pay assignor 95 percent

of net recovery "solely as a [b]onus"); *Steele v. Hartford Fire Ins. Co.*, 788 F.2d 441, 444 (7th Cir. 1986) ("if getting into federal court was the sole purpose of the assignment, then even if the assignment was supported by consideration and was lawful under state law, one could question in just what sense the assignment was bona fide, and, more to the point, could ask whether it is not the precise purpose of section 1359 to discourage people from using the device of assignment to get access to the federal courts").

Courts have cited a variety of factors as bearing on the determination whether the assignment of a claim amounts to collusion for purposes of section 1359. Among the factors courts have considered are:

1. Whether the assignee of the claim lacked a prior connection to the litigation;

2. Whether the assignor of the claim selected the assignee's legal counsel and/or paid for the assignee's litigation expenses;

3. Whether the assignor retained control of the litigation;

4. Whether the assignee agreed to share with the assignor any portion of the recovery;

5. Whether the assignee provided meaningful consideration for the assignment;

6. Whether the timing of the assignment is suspicious; and

    7.   Whether the assignment was motivated by a desire to create diversity jurisdiction.

*YP Recovery Inc. v. Yellowparts Europe, SL*, 2016 WL 4549109, at * 6 (N.D. Ill. Sept. 1, 2016) (St. Eve., J.) (citing, *inter alia*, *Nat'l Fitness Holdings, Inc. v. Grand View Corp. Ctr., LLC*, 749 F.3d 1202, 1205–06 (10th Cir. 2014) (setting out these same seven factors as among those court should consider in evaluating totality of circumstances); *Branson Label, Inc. v. City of Branson, Mo.*, 793 F.3d 910, 916–17 & n.5 (8th Cir. 2015) (agreeing these factors are "a helpful guide" without adopting Tenth Circuit's test); and *Boyd v. Phoenix Funding Corp.*, 366 F.3d 524, 531–32 (7th Cir. 2004) (remanding case removed from state to federal court for determination whether assignment of loans to assignee who filed notice of removal was bona fide assignment or instead designed to evade time limit on removal)). JLL concedes these factors cut both ways in this case but nonetheless asserts that, on balance, they point to collusion. CNH naturally disagrees, emphasizing the factors (including CNH's pre-existing and independent interest in this litigation and in protecting its goodwill by aggregating like claims for disposition in one suit) which weigh against a finding of collusion. But we find it unnecessary to proceed down this multi-factor analysis in order to reject JLL's contention that the dealer assignments amounted to a collusive effort to manufacture federal jurisdiction.

In material respects, this case is on all fours with *Grede v. Bank of New York Mellon*, 598 F.3d 899, 900–01 (7th Cir. 2010). There, the trustee of a liquidation trust holding the assets of a bankrupt investment management firm, Sentinel Management

Group, sued the Bank of New York Mellon, seeking to recover payments to the Bank that the trustee characterized as preferential payments or fraudulent conveyances. There was complete diversity of citizenship as between the trustee (a citizen of Illinois) and the Bank and its parent (citizens of New York and Delaware). The trust was not solely pursuing its own claims in the litigation, however. Some 100 of Sentinel's investors had assigned their own claims against the Bank to the liquidation trust for collection as permitted by the terms of the trust, and the trustee was also pursuing those claims in the suit. A number of those 100 investors were citizens of New York, and as such would not have been able to invoke the court's diversity jurisdiction had they sued the Bank themselves; yet, in the Bank's view, they were the real parties in interest as to the assigned claims. The Bank argued that the assignments to the trust were thus a collusive means of ushering the investors' claims into federal court. Invoking section 1359, the Bank argued that the case should have been dismissed for lack of jurisdiction.

We dispatched the Bank's argument, emphasizing both that diversity jurisdiction was present over the trust's own claims against the Bank and that bringing the assigned dealer claims into the suit was a matter of efficient aggregation of similar claims rather than collusion to create federal jurisdiction where none existed in the first instance. 598 F.3d at 901. Because our analysis in *Grede* bears directly on the facts of this case, we quote it in full:

> A collusive assignment is a genuine jurisdictional problem. We treat an assignment as collusive when its sole function is to shift litigation from state to

federal court. *Steele v. Hartford Fire Insurance Co.*, 788 F.2d 441, 444 (7th Cir. 1986); *Hartford Accident & Indemnity Co. v. Sullivan*, 846 F.2d 377, 382 (7th Cir. 1988).

Assignment to a trust could be designed to take advantage of the rule that a trust's citizenship is that of the trustee, rather than the beneficiaries, for the purpose of 18 U.S.C. § 1332(a). See *Navarro Savings Association v. Lee*, 446 U.S. 458, 100 S. Ct. 1779, 64 L. Ed. 2d 425 (1980). Cf. *Northern Trust Co. v. Bunge Corp.*, 899 F.2d 591 (7th Cir. 1990) (a non-trustee holder of injured parties' claims has the same citizenship as the claims' owners). But it would not be sensible to put the assignments to the Sentinel Liquidation Trust in the collusive category.

The Bank is a citizen of New York; many investors are not, and many individual claims exceed $75,000, so these investors could sue under the diversity jurisdiction in their own names. Or one investor could sue on behalf of a class; only the plaintiff's citizenship would count, much as only a trustee's citizenship counts. See *Snyder v. Harris*, 394 U.S. 332, 340, 89 S. Ct. 1053, 22 L. Ed. 2d 319 (1969). What's more, the Trust already is suing the Bank in federal court in its capacity as holder of Sentinel's claims to recover preferential or fraudulent transfers; the investors' claims could be added under the supplemental jurisdiction. See 28 U.S.C. § 1367; *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546,

> 125 S. Ct. 2611, 162 L. Ed. 2d 502 (2005). The assign-
> ments thus do not move litigation from state to
> federal court; instead they facilitate efficient aggre-
> gation of claims, just as Fed. R. Civ. P. 23 does.
> Subject-matter jurisdiction is secure.

*Grede*, 598 F.3d at 900–01.

Obviously this case does not involve a trust, but in all other respects the relevant circumstances are nearly identical to those at issue in *Grede*. CNH has its own contractual claims against JLL. Those claims lie at the center of the suit and indubitably fall within the diversity jurisdiction of the court. Of the 260 assigned dealer claims, the vast majority involve dealers who are not citizens of either Maryland or Illinois. True, no dealer claim meets the $75,000 threshold, but given the diversity of citizenship, the dealers would qualify as pendent parties entitled to invoke supplemental jurisdiction of the court. § 1367; *Exxon Mobil*, 545 U.S. at 558–567, 125 S. Ct. at 2620–25. As in *Grede*, then, the assignments of those claims to CNH did not serve the function of moving the litigation from state to federal court: CNH's claims independently met the require-ments of section 1332; and most of the dealers' claims could have been pursued via supplemental jurisdiction. The assign-ments serve the function of efficient aggregation rather than collusion to evade the requirements of diversity.

In sum, we are not convinced that the 260 dealer assign-ments amounted to a collusive effort to create federal jurisdic-

tion where it otherwise would not have existed. The district court properly exercised jurisdiction over the assigned claims.[3]

B.  Limitation on liability

JLL's opening argument on the merits of the case rests on the limitation of liability provisions found in Section 26 of the Service Agreement. JLL reads Section 26 to preclude CNH from recovering anything from JLL even if, as the district court found, JLL breached its contractual obligations to CNH. Section 26 of the contract provides:

> Notwithstanding anything else contained herein to the contrary, each party shall look solely to the assets of the other party for satisfaction of any liability or obligations relating to this engagement … and in no event shall [JLL's] liability to CNH and the CNH Dealers collectively … exceed (i) in the case of performance by the Additional Service Providers, the amounts which [JLL] can recover from the Additional Service Providers and their insurers, and (ii) in any other case, the greater of the project management fees paid to [JLL] hereunder or One Million Dollars except for [JLL]'s liability under Section 9A above.

Ex. 1002 § 26. In JLL's view, subsection (i) is the one and only provision of Section 26 applicable to CNH's claims. JLL reasons

---

[3]  In view of our conclusion as to collusion, we need not address CNH's alternative argument that the assigned dealer claims could be dismissed pursuant to Federal Rule of Civil Procedure 21 in order to preserve the judgment as to CNH.

that the harm underlying CNH's complaint stems from the defective vinyl used to manufacture the dealer signs, and CNH's recovery is tied to the cost of replacing those failed signs. JLL, by contrast, was hired to provide management services, not to fabricate the signs; and although it signed the manufacturing contracts on CNH's behalf, those contracts make clear that its liability was limited to its role as manager and that it was not a guarantor as to the quality of the signs themselves. Ex. 52 § 17.012. Thus, CNH's recovery is, in JLL's view, limited by subsection (i) to whatever JLL might be able to recover from Arlon, the vinyl manufacturer. But CNH is already suing Arlon in California state court; for that purpose, CNH took assignment of all the sign manufacturers' rights, title and interest in their claims against Arlon. So there is, in JLL's view, nothing that JLL can recover from Arlon—and CNH can in turn take from JLL pursuant to section 26(i)—that CNH is not already seeking from Arlon directly. And as subsections (i) and (ii) of section 26 are mutually exclusive, JLL reasons, CNH cannot simultaneously invoke both (i) and (ii). In any event, JLL believes that subsection (ii) does not logically apply, as Arlon is the source of CNH's injury. JLL—in its own view—did not commit any independent wrong that injured CNH.

The threshold problem with this argument is that it was not raised below. This is a civil rather than a criminal case, which means that we typically will not entertain an argument raised for the first time on appeal, even for the limited purpose of ascertaining whether a plain error occurred. *E.g.*, *Packer v. Trustees of Indiana Sch. of Medicine*, 800 F.3d 843, 849 (7th Cir. 2015). Compounding the problem for JLL is that JLL did not

simply overlook section 26 below but instead made an argument directly contrary to the one it is making on appeal: JLL argued to the district court that subsection (ii) rather than subsection (i) of section 26 should apply to any recovery by CNH. R. 180 at 33; R. 182 at 44–45. Arguably, then, JLL did not simply forfeit, but deliberately waived, the argument it is making now. *See generally United States v. Olano*, 507 U.S. 725, 733, 113 S. Ct. 1770, 1777 (1993) (distinguishing waiver from forfeiture).

JLL nonetheless contends that we should entertain its appellate argument because the proper construction of a contract presents a question of law, and as such we have the discretion to address it notwithstanding JLL's failure to make (or its choice not to make) the argument below. *See Hively v. Ivy Tech Cmty. Coll. of Indiana*, 853 F.3d 339, 351 (7th Cir 2017) (en banc) (citing *Amcast Indus. Corp v. Detrex Corp.*, 2 F.3d 746, 750 (7th Cir. 1993)); *see generally Singleton v. Wulff*, 428 U.S. 106, 121, 96 S. Ct. 2868, 2877 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the courts of appeals, to be exercised on the facts of individual cases.")

But we are not convinced that we should exercise our discretion to entertain the argument. *See Allen v. City of Chicago*, 865 F.3d 936, 944 (7th Cir. 2017) (noting discretion to take up issues raised for first time on appeal in civil cases is one we exercise "rarely"). Although the proper construction of the Service Agreement may present a legal issue, that issue is not on par with a statutory-construction question that has the potential to affect large numbers of people beyond the parties

to this case. Few beyond JLL and CNH will be affected by our interpretation of their private contract. Moreover, the district court's understanding of the contract, and its application of both subsections (i) and (ii) of section 26, was not obviously wrong. Yes, the defective vinyl that Arlon manufactured certainly lies at the heart of this case, but it is JLL's own breach of its contractual obligations to CNH for which the latter is seeking recovery. CNH's theory of the case is that the defective vinyl ultimately would not have been a problem had JLL properly overseen the manufacturing process, secured the best possible warranty on the vinyl, properly documented the warranty issued, and proactively managed enforcement of the warranty. In this respect, it appears logical for JLL to have invoked subsection (ii) and, accordingly, for the district court, upon finding that JLL had breached its contractual obligations to CNH, to have awarded CNH the fees it had paid to JLL.

At the same time, it is not clear to us that subsection (i) has no concurrent role to play in fashioning a recovery for CNH. JLL has assumed that Arlon constitutes an "Additional Service Provider" to which subsection (i) applies; but we are inclined to agree that it is the sign manufacturers rather than Arlon that are properly deemed Additional Service Providers for purposes of this provision. And just as CNH has sued Arlon, JLL sued the sign manufacturers for their own (purported) contribution to the sign fiasco. That issue will be resolved in arbitration. *See supra* n.2. Assuming that JLL might eventually recover something from the sign manufacturers in the arbitration, we see no reason why JLL may not be obligated to forward the proceeds to CNH pursuant to subsection (ii).

To be clear, we are not reaching the merits of JLL's argument as to the limitation of its liability. We are, rather, citing the plausibility of the district court's construction of the contract as a reason not to overlook JLL's about-face and exercise our discretion to entertain the argument it presents for the first time on appeal.

## C. Breach of contract

JLL next contends that the evidence does not support the district court's findings that it breached its agreement with CNH in multiple respects. Even if a breach was established as to one or more of its contractual duties, JLL argues, CNH did not establish that its damages were the natural and foreseeable result of such breach. We take JLL's various obligations in turn.

### 1. Failure to document warranty

Pursuant to the Statement of Work setting forth the "deliverables" JLL agreed to provide, it was JLL's obligation to supply "[r]esearch and documentation of warranty information for all raw materials and sub components" and to "disclose all elements of [the] Warranty program to CNH and Dealers." Ex. 1002 Attach. B § 1(B) ¶4; § 2(C) ¶1. CNH's claim in this regard is that JLL never properly ascertained and documented the terms of Arlon's warranty on the vinyl, such that all parties understood from the start what those terms actually were. JLL, on the other hand, contends that the terms of Arlon's warranty were clear from the moment Arlon first submitted presentation materials to the parties in its ultimately successful quest to supply vinyl to the sign manufacturers; that CNH approved the selection of all vendors, including Arlon, and the contracts with those vendors; and that the terms of the

Arlon warranty were documented in a summary attached to each of the sign manufacturing contracts. The district court was not persuaded. Judge Stadtmueller found that JLL had essentially paid little attention to the warranty terms and demonstrated a "complete abdication of responsibility" in ascertaining and documenting those terms. He was convinced that had JLL complied with its obligation to research and document the warranty terms, the instant lawsuit would never have occurred. R. 178 at 14.

The record supports the district court's finding that JLL breached its duty to CNH in this regard. We may assume for the moment that Arlon's presentation materials left little doubt as to the warranty terms it was offering. But it is noteworthy that the sole evidence regarding the final warranty terms to which Arlon (purportedly) agreed is the abbreviated summary attached to each of the sign manufacturing agreements. That summary is all that was attached to the manufacturing contracts; it is all that was produced to CNH; and it is all that was produced at trial. But apart from the fact that this was only a summary rather than a full statement of the warranty terms, it is unknown who even prepared that summary—JLL itself did not. JLL's first project manager attributed the duty to maintain custody of the warranty to the sign manufacturers. But the Service Agreement places the obligation to document the warranty terms on JLL. It is inconceivable that JLL did not obtain formal documentation of the terms from Arlon itself; if JLL did so, it was never able to produce a copy. Indeed, JLL's project manager was not even sure whether the summary itself was accurate. The failure to obtain a copy of the actual warranty gave rise to doubt as to what Arlon's obligations were,

and that uncertainty made it easier for Arlon to contend, as it ultimately did in 2014, that its responsibilities to replace the defective vinyl were at an end.

One might reasonably conclude that JLL breached its obligations to document the Arlon warranty for a second time when, in 2011, Arlon promised to replace any and all failing signs at its cost. Evidently, there was no memorialization of that promise, upon which Arlon of course later reneged when the extent of the problem with the defective vinyl, and the corresponding costs to Arlon in replacing the signs, became fully apparent. That JLL did not insist upon Arlon documenting its 2011 commitment in a contract that would have effectively broadened and extended its warranty and bound Arlon to its promise reflects a second lapse in judgment on its part.[4] By this time, JLL knew that there were serious deficiencies in Arlon's vinyl production that would necessitate the replacement of a significant number of installed signs, at substantial cost. The need for certainty as to Arlon's obligations could not have been clearer by that point in time.

2. Failure to negotiate best possible warranty

Closely related to JLL's obligation to research and document the terms of Arlon's warranty was the obligation to negotiate the most favorable warranty on CNH's behalf. In the

---

[4] When asked about the failure to demand that Arlon put its promise in writing by modifying the warranty terms, JLL's project manager simply stated, "No. I got results. It occurred." R. 180 at 108. He seemed to believe that the warranty was "a one-time event." R. 180 at 110. But we can see no reason why JLL could not have insisted that Arlon modify its warranty by placing its full-replacement commitment in writing.

Warranty Assurance section of the Statement of Work, JLL "guarantee[d] negotiation of the best possible Warranty program for [the] Family of Signs manufactured … ." Ex. 1002 Attach B § 2(C) ¶1. There is no dispute that this guarantee extends to the warranty on the sign components, including the vinyl supplied by Arlon, as well as the warranty on the signs themselves. Indeed, CNH has argued that JLL breached this obligation with respect to both warranties. But as we think JLL's omissions with respect to the Arlon warranty are sufficient to establish that it breached this duty, we confine our analysis to that warranty alone.

In the Program Specifications Arlon submitted to JLL in support of its successful endeavor to be selected as the vinyl manufacturer for the new signs, Arlon compared the warranties on its products with those of a leading competitor to demonstrate that its warranties (seven years or longer in most instances, depending on where the signs were installed) were more generous. JLL concedes that it would have been possible to obtain a longer and better warranty from Arlon than the one it provided, but it casts doubt on the notion that CNH would have been willing to pay the additional cost that an upgrade to the warranty terms likely would have entailed. JLL emphasizes that CNH accepted a reduction in the length of the warranty from the sign manufacturers on the completed signs from three years to one in order to cut costs and make the sign replacement program more palatable to the dealers. How then, JLL asks, can it be faulted for not seeking a longer warranty on the vinyl components of the signs?

The important point, to our mind, is that the record reflects no effort at all by JLL to negotiate more favorable warranty

terms on CNH's behalf, or even to ascertain what the possibilities were. JLL's project manager believed that he discussed the warranty with Arlon's representative to confirm that the terms were commensurate with those offered by other manufacturers, but he could not recall any specifics. To be fair, as Judge Stadtmueller pointed out, the record indicates that none of the parties gave much thought to the warranty terms. But the obligation to do so was JLL's, and so far as the record reveals, it simply accepted the terms as Arlon offered them—and as set forth above, did nothing whatsoever to document them. The dispute between Arlon and the other parties about the extent of Arlon's obligation illustrates the significance of JLL's failure in this respect. Certainly it is possible that CNH would not have agreed to pay for a better warranty on the vinyl; the record supports the inference that CNH was interested in the opportunity to reduce costs wherever possible. The fact that CNH accepted a shorter warranty on the completed signs is consistent with that possibility. Then again, it is also possible that CNH, in view of the shorter, one-year warranty on the signs themselves—the risk of which was aired in "many discussions," according to JLL (R. 180 162)—might have chosen to pay for a longer warranty on a critical component of the signs. This is particularly so given that Arlon was formulating custom-colored vinyl with no history in the field to establish its viability. In any case, the obligation to present that option to CNH lay with JLL, which did nothing to explore the possibility of a stronger warranty and determine whether CNH was interested in such a warranty. There was no clear error in Judge Stadtmueller's finding that JLL breached its obligation to CNH in this respect.

3. Failure to manage warranty program

An additional pledge that JLL made as part of its Warranty Assurance commitment was "to provide ongoing Project Management services for Warranty with One-Year from [the] date of installation." Ex. 1002 Attach. B § 2(C) ¶2. The wording of this pledge is a bit stilted, but we take it that JLL agreed to manage any and all warranty matters that presented themselves with respect to individual signs for a period of one year following the installation of the sign. In CNH's view, JLL's commitment in this respect entailed the obligations to (a) ascertain the terms of the warranties on the signs, and (b) ensure that any warranty claims were timely submitted to the sign manufacturers and the vendors who supplied the components of the signs, including Arlon in particular. Again, our focus here is on JLL's actions and omissions with respect to Arlon.

The evidence certainly supports the district court's finding that JLL breached its obligations in this regard. We have already discussed JLL's omission to document the terms of Arlon's warranty on the vinyl, which fostered uncertainty as to the extent of Arlon's obligation to replace defective signs. The critical failure insofar as this claim is concerned is JLL's failure to pursue a more proactive, global approach to warranty management once it became clear that the vinyl on significant numbers of installed signs was failing in the field. It is true, as JLL takes pains to emphasize, that as the problem emerged, Arlon promised to replace any defective signs at its cost. JLL took Arlon at its word, and to an extent, that is understandable: Arlon had a reputational interest in fixing its mistakes and ensuring that a large customer like CNH was

satisfied with the final product. But it is also reasonable to expect that JLL, a sophisticated party with extensive experience and expertise in the logistics of large-scale projects like CNH's re-branding program, would anticipate and plan for the worst-case scenario. JLL understood that the manufacturers' warranty on the signs themselves did not extend beyond one year, and that although Arlon's warranty on the vinyl itself extended beyond that period, its obligations as to related replacement costs (including labor) likewise dropped off after the one-year mark. Once it was clear that the issue with the vinyl was not isolated, it was JLL's obligation to take all reasonable steps to ascertain the scope of the problem and to ensure that all failures were detected and remediated in a timely manner, so that its client would obtain the full benefit of the relevant warranties.

The evidence supports the district court's finding that JLL did not do this. There is, to be sure, a dispute in the testimony as to whether JLL suggested some form of audit of the installed signs and was turned down by CNH or whether it was the other way around. As the factfinder, the district judge was free to credit CNH's testimony on this point. And having done so, Judge Stadtmueller plausibly concluded that JLL's passive acceptance of Arlon's assurances breached its obligation to manage the warranties on CNH's behalf, with the result that CNH was left to deal on its own with a large number of defective signs when Arlon announced that its warranty obligations were at an end and it would no longer take responsibility for replacing any signs at its cost.

4. Failure to exercise quality control

Finally, in the Statement of Work, JLL agreed to assume "[d]irect control and responsibility of all manufacturing including quality control meeting all Provider and CNH expectations." Ex. 1002 Attach. B § 1(C) ¶1. The district court found that the quality-control obligation extended to Arlon's production of the vinyl, and we agree that this is a reasonable interpretation of the provision. As JLL points out, the agreement also gave it the power to delegate its duties, including this one, to the sign manufacturers. Ex. 1002 § 1(B). Even so, to the extent CNH was harmed by the failure to ensure that Arlon's product was produced according to specifications—which plainly it was—JLL may be faulted for not ensuring that the sign manufacturers themselves took appropriate steps to identify and correct any failings in Arlon's manufacturing process.

Arlon, of course, bears the blame for its deliberate concealment of the discovery in 2012 that all of the blue vinyl it had theretofore been producing for the signs was defective. But JLL's contractual obligation to exercise control over the manufacturing process, including quality control, entailed an independent obligation to anticipate and rectify such problems. When sign after sign was reported to JLL as being defective, JLL arguably was obliged to look beyond what Arlon was telling it about the vinyl and to take steps to independently evaluate the nature of the problem.

This JLL never did. As the district court pointed out, there were options available to JLL: it could have arranged for independent sampling and testing of the vinyl, and rather than

waiting to see how the completed and installed signs fared in the field over time it could have subjected vinyl samples to testing in a weatherometer. There is no real dispute that such steps would have made it possible to confirm that the vinyl Arlon was producing was defective. Indeed, according to Arlon's internal emails, weatherometer testing is what led it to conclude in 2012 that all formulations of the blue vinyl used on the CNH signs to date were defective. Given these facts, no expert testimony was necessary to demonstrate what JLL could have done to expose the defective vinyl and why, given industry best practices, it should have done so. Particularly given the pattern of sign failures and the number of signs involved, JLL was on notice of the need to investigate the source and extent of the problem. The steps necessary to make those determinations might have been costly, but once it became clear that the failures were not an isolated problem, JLL became obligated to do *something* other than rely on Arlon's assurances. If nothing else, it could have demanded to see Arlon's own testing data, which would have involved no cost at all.[5] Judge Stadtmueller found it "inconceivable" that JLL did not pursue any such avenues and simply accepted Arlon's assurances. R. 178 at 15. There was no clear error in his finding.

---

[5]   JLL's project manager testified that he did ask for Arlon's testing data when the first failure occurred but conceded that he never got it, choosing instead to accept Arlon's representation that it had identified and fixed the problem with the vinyl. "I wanted a full explanation. I did not get that. I did not get testing information. I had got resolution that it was solved." R. 180 at 90.

D.  Damages for breach

The district court found that CNH had incurred a loss of $5,482,735 as a result of JLL's contractual breaches, relying on the testimony of CNH's expert as to the costs entailed in replacing the defective signs. JLL contends that the district court's damages calculation is flawed in two respects.

JLL's initial contention is that the loss calculation significantly exceeds CNH's actual sign-replacement costs, pointing out that not all installed signs failed, some signs were already replaced by Arlon, and some signs were self-installed by dealers, who agreed to a voiding of the warranties on the signs in exchange for the reduced costs of installing the signs themselves. But JLL stipulated below that a specified number of sign faces and other parts had failed, that CNH had contracted with another firm to replace the failed signs, and that CNH would incur specified costs to replace the defective signs. R. 174 ¶¶ 1–9. CNH's expert relied on those stipulations in calculating his loss figure, not on any assumptions about what broader category of signs might fail in the future. R. 181 at 67. If JLL believed that these stipulated numbers were over-inclusive or inaccurate in some respect, it is not clear why it agreed to them. Indeed, JLL does not respond at all in its reply brief to CNH's contention that JLL stipulated to the basis for its loss calculation. We need not explore this point further.

CNH's broader point is that the loss calculation essentially holds JLL to account for Arlon's failures. In JLL's view, the court, by using the cost to replace failed signs as the measure of CNH's damages, essentially held JLL liable for Arlon's poor workmanship and breach of warranty on the signs.

But the district court's findings make clear that JLL's own failures with respect to quality control in the manufacturing process and with respect to the warranty on the vinyl made the defective-sign problem much worse for CNH than it otherwise would have been. As we have discussed, the evidence supports the court's findings that had JLL taken the initiative to test Arlon's vinyl once problems began to surface, the flaws in Arlon's manufacturing process would have been exposed much sooner than they were and the number of completed and installed defective signs would have been much smaller than it turned out to be. Likewise, had JLL properly documented and managed the Arlon warranty on the vinyl, it would have been more aggressive in identifying defective signs and filing timely warranty claims to ensure that CNH had maximum coverage as to the signs.

Consequently, we can find no clear error in the district court's loss assessment. The basis for JLL's liability certainly was distinct from Arlon's, but the measure of the loss to CNH is essentially the same: the cost to replace the defective signs, the pool of which JLL might have limited to a much smaller group had it not breached its contractual duties to CNH.

E.  Waiver of right to object to JLL's performance

1. Waiver by conduct and duty to speak

JLL contends that to the extent its performance fell short of standards specified by contract, CNH waived any shortcoming by virtue of its own conduct in accepting JLL's performance in silence rather than voicing an objection. As JLL sees things,

nothing about Arlon's warranty or the number of failing signs[6] was a secret—CNH was involved from the start with the selection of Arlon as a vendor and on through the entire warranty claims process on the defective signs—and yet CNH never indicated that it wanted a better warranty than the one Arlon proposed, that it wanted outside testing on Arlon's product once the first problems with the vinyl were noticed, or that it wanted JLL to handle the replacement of defective signs differently. Having sat back in silence for years while the problems with Arlon's vinyl unfolded and JLL endeavored to address them, CNH cannot now claim that JLL should have negotiated a better warranty on the vinyl, taken the initiative to have outside testing done on the vinyl, and been more aggressive in making sure that faulty signs were identified, presented to Arlon, and replaced within the warranty period.

JLL bears a significant burden on this line of argument, and the district court by no means clearly erred in rejecting it. Waiver entails the voluntary and intentional relinquishment of known right. *See United States v. Olano*, *supra*, 507 U.S. at 733, 113 S. Ct. at 1777. So to establish waiver, JLL was required to show that CNH realized JLL's performance did not satisfy its contractual obligations and chose nonetheless to accept JLL's performance as it was.

On the matters of quality control and warranty management, JLL stresses that CNH had the power, as it did with other aspects of the sign project, to approve and disapprove of

---

[6]  Arlon, of course, did conceal the scope of the problem with its vinyl, but it kept *both* JLL and CNH in the dark in this regard.

particular proposals, and that although it regularly exercised that authority, it was silent with respect to JLL's handling of the problems with the early runs of Arlon's vinyl. But this assumes that CNH had a duty to speak up if it was concerned about something JLL was doing, at pain of waiving its contractual rights if it did not.

CNH did not have a duty to speak up. JLL concedes it "ran the program at the granular level." JLL Brief at 41. Under the express terms of the contract, it was JLL's obligation to monitor the manufacturing process and to deal with problems that emerged as it saw fit. JLL is effectively trying to transfer that duty to CNH by asserting that it was CNH's duty to affirmatively ask JLL to more aggressively manage the production process if that is what CNH expected and wanted. This is turning the contract on its head. CNH no doubt had the authority to sign off upon or object to any particular proposals that JLL presented to it. But the responsibility to oversee and correct the manufacturing process, as necessary, was JLL's in the first instance. Taking the facts as the district judge found them, nothing suggests either that CNH had some unique knowledge that might have triggered a duty to speak on its part or that CNH stood in the way of JLL taking a more proactive approach with respect to Arlon and its problematic vinyl.

As for the warranty on the vinyl: Although CNH may have accepted the warranty as presented to it, CNH cannot be charged with knowing and accepting the fact that JLL had failed to even ascertain what warranty options were available, let alone negotiate the best possible warranty. Nor is there any evidence showing that CNH knew that the only documenta-

tion of the warranty in JLL's possession was nothing more than an incomplete summary prepared by an unknown third party.

Finally, with respect to JLL's warranty management responsibilities, it is a fair inference from the record that CNH accepted JLL's assurances as to what the term of Arlon's warranty were and as to Arlon's commitment to replace the defective signs. And certainly CNH participated in the claims submission process. But there is no evidence that CNH realized the extent to which JLL's chosen course of action with respect to enforcement of the warranty placed CNH at risk of being left with a substantial number of defective signs if and when Arlon ceased cooperating, as it ultimately did. At worst, CNH deferred to JLL in handling the warranty matters, but that was wholly consistent with the contract between CNH and JLL. JLL in turn chose to place its trust in Arlon, which in retrospect was a mistake.

2. Acceptance of "deliverables"

JLL makes a second waiver argument that is rooted in the notice-and-opportunity-to-cure provisions of its contract with CNH. The Statement of Work describing JLL's responsibilities under the Agreement identified the particular services JLL was to provide—which constitute what the Agreement refers to as "deliverables"—along with a set of supporting requirements ("acceptance criteria") for each such service. Section 1(D) of the Service Agreement sets forth the parties' respective responsibilities with respect to these "deliverables": (1) JLL would furnish a deliverable; (2) CNH in turn would evaluate the deliverable to decide whether it satisfied the acceptance criteria in material respects and, if not, inform JLL of the shortcomings

(and the necessary corrections) in writing; (3) JLL would then make its best efforts to fix the problem and resubmit the deliverable to CNH; and (4) if JLL was unable to remedy the non-conforming aspect of the deliverable, CNH would have the right to terminate the agreement. Ex. 1002 § 1(D). JLL's point is that not until 2014, when Arlon announced that it was no longer willing to stand by its commitment to replace the defective signs at its cost, did CNH ever signal to JLL that it was dissatisfied with any aspect of JLL's performance. Several of the service obligations that CNH faults JLL for mis-handling in this litigation constitute (or overlap with) deliverables that are identified in the Statement of Work—including negotiating the warranty terms, researching and documenting the warranty information, exercising quality control, and overseeing post-installation problems with the signs. By not registering timely written objections to JLL's work in these areas and giving JLL the opportunity to cure the shortcomings, JLL argues, CNH failed to comply with the contractual provisions for non-conforming deliverables and thereby waived the objections it has pursued in this litigation.

We reject this contractual argument for the same reasons that we rejected JLL's generic waiver argument. Apart from the awkward fit between JLL's undefined "deliverables" terminology and services that were, in many instances, ongoing in nature, the argument either presumes awareness on CNH's part of the shortcomings in JLL's performance or demands that CNH have regularly cross-examined JLL as to what steps it had or had not taken or considered in delivering services to CNH. For example, it presumes that when JLL advised CNH what the warranty terms were on the Arlon vinyl, CNH should

have asked JLL what the range of possible warranties was, what efforts JLL made to negotiate the warranty terms with Arlon, what the costs associated with each warranty option were, and why JLL chose or accepted the warranty terms it was relaying to CNH. Only in that way could CNH evaluate how effective JLL had been in negotiating the warranty terms. Likewise with quality control. If JLL's point is that CNH should have alerted it to any dissatisfaction CNH had with its handling of the early reports of problems with the Arlon vinyl, for example, then one must presume that CNH knew what measures JLL had or had not taken with Arlon to confirm that the problems with the vinyl had indeed been corrected. That in turn would require either that JLL have briefed CNH thoroughly on these points (which the evidence does not show) or that CNH took the initiative to interrogate JLL: What did Arlon tell you was the source of the problem? How can you be confident that the problem has been corrected? What if any testing data did Arlon provide you? What other options did you consider to verify that the problem has been addressed? And so on.

But, again, imposing on CNH the duty to look behind JLL's recommendations and services is inconsistent with the role that JLL assumed in managing the sign project. CNH wanted a firm that could provide turnkey management and that is what JLL undertook to provide CNH. Unless JLL can show that CNH was contemporaneously aware of the sorts of shortcomings Judge Stadtmueller found in JLL's performance, then CNH cannot be faulted for failing to cite these failures to JLL and giving it the chance to remediate them. The evidence does not show this. Not until May of 2014, when Arlon essentially

abandoned its commitment to replace the defective signs at its own expense could CNH have begun to appreciate the ramifications of JLL's failures to negotiate a robust warranty on the vinyl, to properly verify and document the warranty terms, and to exercise more proactive quality-control oversight over the manufacturing process. True, CNH elected not to fire JLL immediately when this occurred. But insofar as the contractual obligations underlying the judgment are concerned, the ship had long since sailed. JLL has not convinced us that there was any correction it could have made in 2014 that would have materially reduced the damages that CNH already had incurred. (Nor has it undertaken to show what portion of the judgment might be attributable to the period of time after May 2014.) There was no contractual waiver.

F.   Admission of parties' pre-contractual conduct

Finally, in its opening brief, JLL has made a cursory argument that the district court erred by admitting certain evidence as to the parties' course of conduct prior to entering into their contract. In view of the integration clause in the agreement, JLL argues, such evidence was inadmissible.

But not until its reply brief did JLL make any effort to explain what pre-contract evidence in particular was entertained and how it may have factored into the district court's merits decision, thus depriving CNH of the opportunity to respond to the argument in a meaningful way. This is too late in the day. *E.g.*, *Bitsin v. Holder*, 719 F.3d 619, 630 n.23 (7th Cir. 2013). JLL waived the argument.

### III.

For all of the reasons discussed in this opinion, the judgment in favor of CNH is AFFIRMED.