In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-4234

DELORES HENRY, *et al.*,

*Plaintiffs-Appellants*,

*v.*

MELODY HULETT, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Central District of Illinois.
No. 12-CV-3087 — **Richard Mills,** *Judge*.

ARGUED MAY 14, 2020 — DECIDED AUGUST 11, 2020

Before SYKES, *Chief Judge*, and FLAUM, EASTERBROOK, MANION, KANNE, ROVNER, WOOD, HAMILTON, BARRETT, BRENNAN, SCUDDER, and ST. EVE, *Circuit Judges*.

ST. EVE, *Circuit Judge*. Plaintiffs—a class of more than 200 current and former female inmates at Lincoln Correctional Center—brought this action following mass strip searches conducted as part of a cadet training exercise in 2011. They contend that the circumstances of the searches—particularly

the intrusive and degrading manner in which they occurred—violated their Fourth and Eighth Amendment rights.

Defendants—various prison officials—moved for summary judgment before the district court, arguing that our circuit's prior decisions foreclosed Plaintiffs' Fourth Amendment claim. The district court agreed, concluding that, under *Johnson v. Phelan*, 69 F.3d 144 (7th Cir. 1995), and *King v. McCarty*, 781 F.3d 889 (7th Cir. 2015) (per curiam), convicted prisoners do not maintain a privacy interest during visual inspections of their bodies. A divided panel of our court affirmed that decision, following the same reasoning. We granted Plaintiffs' petition for rehearing *en banc* and vacated the panel's opinion and judgment.

We hold that the Fourth Amendment protects a right to bodily privacy for convicted prisoners, albeit in a significantly limited way, including during visual inspections. We therefore reverse the district court's entry of partial summary judgment for Defendants on Plaintiffs' Fourth Amendment claim and remand for further proceedings.

## I. Background

### A. Factual Background

We consider the facts in the light most favorable to Plaintiffs, the nonmoving parties, as we must do when reviewing a district court's grant of a summary judgment motion. *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020). On March 31, 2011, administrators at Lincoln Correctional Center—a medium security facility of the Illinois Department of Corrections ("IDOC") in Logan County, Illinois, housing approximately 1,000 female inmates—held a cadet training exercise. This training exercise simulated a "mass shakedown"—a

practice where IDOC employees search inmates' living areas and perform strip searches of the inmates' persons to find contraband. Lincoln Warden Melody Hulett testified that she could not "think of any reason other than the training of cadets that [she] ordered a shakedown on March 31st, 2011, at the Lincoln facility." No evidence in the record indicates the presence of an ongoing emergency or heightened concern on the day that the training exercise took place.

Orange Crush tactical team members, cadets from the IDOC training academy, and correctional officers at Lincoln carried out the mass shakedown. Orange Crush members donned full riot gear—wearing helmets, armored vests, and military boots and carrying batons, pepper spray, and shields. After attending a briefing, Orange Crush members, correctional officers, and cadets stormed two housing units—ones that Hulett chose at random—banging their batons on the walls, doors, and their hands. As the exercise began in the early morning, correctional officers and cadets yelled at inmates to wake up and form a line.

Correctional officers and cadets lined up 200 of the inmates in rows, forced them to stand facing the wall, called them "bitches," and threatened to put them in segregation if they were not quiet. Cadets practiced handcuffing prisoners. Some elderly prisoners cried in pain as a result of standing for a long period while handcuffed. Prisoners are typically handcuffed at Lincoln only when sent to the segregation unit for committing a serious violation of a prison rule.

The officers directed the women to the gym while screaming obscenities at them and calling them sexually derogatory names. In the gym, correctional staff forced the women to stand facing the wall, shoulder to shoulder. Orange Crush

members and other officers ordered cadets to perform strip searches on groups of four to ten women at a time. Prisoners were required to stand until cadets strip searched them—in some cases waiting five to seven hours. The women could not sit, get a drink of water, or use the restroom for the duration of the training exercise.

Female cadets performed the strip searches, which occurred in a bathroom and beauty shop adjacent to the gym. The bathroom was open to the gym, allowing many male correctional officers and cadets to see the strip searches taking place. The beauty shop was also visible from the gym and had mirrored walls, allowing those passing by to witness the strip searches. As a result, many people who were not performing the strip searches nevertheless observed the female inmates.

When cadets strip searched the women, they forced them to remove all clothing and stand in a line, nearly shoulder to shoulder. Officers and cadets ordered the women to raise their breasts, lift their hair, turn around and bend over, spread their buttocks and vaginas, and cough several times. Women were forced to stand naked for as long as fifteen minutes, far longer than a typical strip search because of its group nature.

During the searches, correctional officers made demeaning and derogatory insults, calling Plaintiffs "dirty bitches." One commented: "No man wants to be with you because you smell like death." Plaintiffs declared that they received comments like "Your Pussy stinks," "You all are fucking disgusting," and "I can't believe women smell like this."

The officers and cadets ordered menstruating prisoners to remove feminine products and dispose of them on the floor and in overflowing garbage cans, in full view of others.

Women stood barefoot on the bathroom floor, which was dirty with menstrual blood and other bodily fluids. While they waited in the gym for the searches to finish, women did not receive replacement feminine hygiene products and were left to bleed on themselves for several hours, soaking through their clothes and getting blood on their legs and feet.

During the strip searches, one inmate pulled three pills out of her vaginal cavity. Prison officials recovered contraband from the cells of approximately 45 of the 200 inmates. Dozens of prisoners submitted grievances after the exercise. Many never received a response. No one ever completed an internal investigation, and no employee received any discipline.

**B. Procedural Background**

Ieshia Brown, Delores Henry, Patricia Philipps, and Jacqueline Hegwood filed a putative class action alleging that Warden Melody Hulett, Assistant Warden Russell Reynolds, and a group of other supervisors and correctional officers violated their Fourth, Eighth, and Fourteenth Amendment rights. Plaintiffs sought damages and injunctive relief prohibiting future public group strip searches during cadet training exercises.

The district court certified several classes seeking both damages and injunctive relief: (1) women subjected to the March 2011 searches who remain in IDOC custody; (2) women subjected to the March 2011 strip searches who had been released from custody; and (3) women who are currently incarcerated at Logan Correctional Center, the facility that now houses all of the inmates formerly at Lincoln, or will be incarcerated there in the future.

Defendants moved for summary judgment. In their motion, Defendants did not dispute that Plaintiffs' factual assertions, if true, supported an Eighth Amendment claim. Regarding Plaintiffs' Fourth Amendment claim, however, Defendants argued that, pursuant to *Hudson v. Palmer*, 468 U.S. 517 (1984), and *Johnson*, "there is no Fourth Amendment protection against searches for prison inmates." Defendants did not raise a qualified immunity defense, nor did they argue that Plaintiffs failed to present evidence of physical injury pursuant to the Prison Litigation Reform Act ("PLRA"). *See* 42 U.S.C. § 1997e(e).

The district court granted summary judgment for Defendants on Plaintiffs' Fourth Amendment claim. The court reasoned that the strip searches here were limited to visual inspections of the naked body, putting them squarely in line with our decisions in *Johnson* and *King*. These cases, the court concluded, foreclosed Plaintiffs' Fourth Amendment claim. Because the district court concluded that no relief was available to Plaintiffs under the Fourth Amendment, it did not perform the reasonableness analysis that Fourth Amendment claims demand.

The parties proceeded to trial on Plaintiffs' Eighth Amendment claim. The court instructed the jury that, to prevail, Plaintiffs had to prove that each defendant "was deliberately indifferent to a substantial risk that the strip searches were being conducted in a harassing manner intended to humiliate and cause psychological pain." During closing arguments, Defendants stressed: "To prevail, the plaintiffs need to prove that these individuals intended for them to be harassed and humiliated, for them to suffer psychological pain during these strip searches, that they didn't truly intend to find

contraband to conduct the strip search." The jury returned a verdict for Defendants.

Plaintiffs appealed the district court's summary judgment ruling on their Fourth Amendment claim, arguing that the district court erred in holding that the Fourth Amendment does not protect prisoners during visual bodily searches. In addition to defending the district court's ruling, and after failing to raise the issue below, Defendants argued that we should affirm the district court's decision because, even if the Fourth Amendment does cover the searches at issue, they are entitled to qualified immunity. Defendants further argued that Plaintiffs are not eligible to receive the relief they seek for several reasons, including that they may not receive compensatory damages because they did not present evidence of physical injury pursuant to the PLRA and that the district court erred in certifying Plaintiffs' damages classes. Plaintiffs did not appeal the jury verdict on their Eighth Amendment claim.

A divided panel of our court affirmed the district court's judgment. Relying on *Hudson* and *King*, the panel determined that the strip searches fell outside of the protection of the Fourth Amendment. We granted Plaintiffs' petition for rehearing *en banc* and vacated the panel's opinion and judgment.

## II. Discussion

We review a district court's summary judgment ruling de novo and consider the facts and draw all inferences in the light most favorable to the nonmoving party. *Hall*, 953 F.3d at 950. Summary judgment is appropriate when "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

**A. Fourth Amendment**

We first address the issue at the heart of this appeal: whether convicted prisoners retain a Fourth Amendment right to privacy during visual inspections of their bodies. The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Strip and body cavity searches are "searches" of "persons" under the meaning of the Fourth Amendment. *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 326–27, 339 (2012); *Bell v. Wolfish*, 441 U.S. 520, 560 (1979).

The "touchstone" of the Fourth Amendment analysis is whether a person has a "constitutionally protected reasonable expectation of privacy." *Oliver v. United States*, 466 U.S. 170, 177 (1984) (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)). The Fourth Amendment does not protect every subjective expectation of privacy, but those expectations "that society is prepared to recognize as 'reasonable.'" *Id.* (quoting *Katz*, 389 U.S. at 361); *see also Smith v. Maryland*, 442 U.S. 735, 740–41 (1979). Assessing whether a search violated a person's Fourth Amendment rights "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell*, 441 U.S. at 559.

The Supreme Court has yet to address the specific question of whether convicted prisoners maintain a reasonable expectation of privacy in their bodies when it comes to visual strip searches. In *Bell v. Wolfish*, while addressing a Fourth

Amendment claim against a policy of routinely strip searching inmates after contact visits, the Court assumed without deciding "that inmates, both convicted prisoners and pretrial detainees, retain some Fourth Amendment rights upon commitment to a corrections facility." 441 U.S. at 558.

Subsequently, in *Hudson*, the Court announced a limited categorical rule: the "Fourth Amendment proscription against unreasonable searches does not apply within the confines of the *prison cell*." 468 U.S. at 526 (emphasis added). Importantly, *Hudson* left open the question of whether, and to what extent, prisoners maintain a right to privacy in their bodies. As we have stated before, we do not read *Hudson* so broadly as to foreclose that right. *See Sparks v. Stutler*, 71 F.3d 259, 261 (7th Cir. 1995) ("*Hudson* did not require the Court to decide what interests prisoners retain in their bodies, as opposed to their surroundings."); *Forbes v. Trigg*, 976 F.2d 308, 312 (7th Cir. 1992) ("[P]rison inmates retain protected privacy rights in their bodies, although these rights do not extend to their surroundings." (citing *Hudson*)). Justice O'Connor's concurrence in *Hudson* emphasized the narrowness of the Court's holding: the Court addressed specifically inmates' "privacy and possessory interests in personal effects" and "searches and seizures of the contents of an inmate's cell," not the entirety of rights potentially available to inmates under the Fourth Amendment. *Hudson*, 468 U.S. at 538 (O'Connor, J., concurring). Although our dissenting colleague asserts that a conviction extinguishes all of a prisoner's Fourth Amendment rights, the Supreme Court has never extended the scope of *Hudson* to exclude any aspect of a prisoner's life beyond her cell from the reaches of the Fourth Amendment. *See King v. Rubenstein*, 825 F.3d 206, 215 (6th Cir. 2016) ("[N]othing in

*Hudson* indicates the Supreme Court intended to abrogate a prisoner's expectation of privacy beyond his cell.").

Although it did so in *Hudson*, the Court generally advises "caution in approaching claims that the Fourth Amendment is inapplicable" as a categorical rule in a particular context. *Hudson*, 468 U.S. at 525 (majority opinion); *see also id.* at 537 (O'Connor, J., concurring) ("The Fourth Amendment 'reasonableness' determination is generally conducted on a case-by-case basis[.]"). We do not think it naturally follows that, because the Court created a categorical exception to a prisoner's Fourth Amendment rights in her cell, the Court intended to expand that rule to also deprive a prisoner of all Fourth Amendment protections in her body. Indeed, the Supreme Court has indicated several times that the privacy interest in one's body is more acute than the interest in one's property. *See United States v. Flores-Montano*, 541 U.S. 149, 152 (2004) ("highly intrusive searches of the person" implicate "dignity and privacy interests" that "simply do not carry over to vehicles"); *Wyoming v. Houghton*, 526 U.S. 295, 303 (1999) (recognizing that searches of a person's body receive "significantly heightened protection" under the Fourth Amendment as compared with property searches); *Ybarra v. Illinois*, 444 U.S. 85, 91–92 (1979) (holding that a search warrant for a tavern and its bartender did not permit body searches of all the bar's patrons); *United States v. Di Re*, 332 U.S. 581, 587 (1948) (holding that probable cause to search a car did not justify a body search of a passenger). These decisions, at the very least, deter us from assuming that one's privacy interest in her property is tantamount to one's privacy interest in her person.

Although *Hudson* does not directly address the issue before us, it frames our analysis. No "iron curtain" separates

prisons from the Constitution. *Hudson*, 468 U.S. at 523 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 555 (1974)). Thus, prisoners must "be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration." *Id*. And, as in all other Fourth Amendment inquiries, prisoners retain Fourth Amendment rights only if a "'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy'" is at stake. *Id.* at 525 (quoting *Smith*, 442 U.S. at 740). As a practical matter, certain rights must be restricted to make way for "a myriad of 'institutional needs and objectives' of prison facilities." *Id.* at 524 (quoting *Wolff*, 418 U.S. at 555); *see also Bell*, 441 U.S. at 545 ("[S]imply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations.").

In *Hudson*, the Court concluded that the right to privacy in possessions and living quarters was one such right that must succumb to these concerns, as it was "fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order." 468 U.S. at 527–28. As a result, the Court held that "society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell." *Id.* at 525–26. We similarly must now decide whether an inmate's expectation of bodily privacy "is the kind of expectation that 'society is prepared to recognize as reasonable,'" given the safety and security concerns inherent to the prison context. *Id.* at 525 (quoting *Katz*, 389 U.S. at 361).

Strip searches are "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission." *Mary Beth G. v.*

*City of Chicago*, 723 F.2d 1263, 1272 (7th Cir. 1983). We have recognized that "[o]ne of the clearest forms of degradation in Western Society is to strip a person of his clothes. The right to be free from strip searches and degrading body inspections is thus basic to the concept of privacy." *Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994). The privacy interest in one's body is clearly a heightened and fundamental one. And while prison security requires officials to constantly monitor prisoners' cells, the same is not true of their unclothed persons.

We conclude that a diminished right to privacy in one's body, unlike a right to privacy in one's property and surroundings, is not fundamentally incompatible with imprisonment and is an expectation of privacy that society would recognize as reasonable. We therefore join every other circuit to have addressed the question and hold that the Fourth Amendment protects (in a severely limited way) an inmate's right to bodily privacy during visual inspections, subject to reasonable intrusions that the realities of incarceration often demand. *See, e.g.*, *Cookish v. Powell*, 945 F.2d 441, 445–46 (1st Cir. 1991) (per curiam); *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016) (per curiam); *Parkell v. Danberg*, 833 F.3d 313, 325 (3d Cir. 2016); *Bushee v. Angelone*, 7 F. App'x 182, 184 (4th Cir. 2001) (per curiam); *Hutchins v. McDaniels*, 512 F.3d 193, 196 (5th Cir. 2007) (per curiam); *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 572 (6th Cir. 2013); *Franklin v. Lockhart*, 883 F.2d 654, 656–57 (8th Cir. 1989); *Nunez v. Duncan*, 591 F.3d 1217, 1227–28 (9th Cir. 2010); *Farmer v. Perrill*, 288 F.3d 1254, 1259–60 (10th Cir. 2002); *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993). Thus, when evaluating a prisoner's Fourth Amendment claim regarding a strip or body cavity search, courts must assess that search for its reasonableness, considering "the scope of the particular intrusion, the manner in which it

is conducted, the justification for initiating it, and the place in which it is conducted." *Bell*, 441 U.S. at 559.

We highlight that our holding today—that inmates maintain a privacy interest, although diminished, in their bodies—pertains to pretrial detainees and convicted prisoners alike. Importantly, *Hudson* drew no distinction between these two categories in its analysis; rather, the Court focused on the heightened concerns over safety and security emblematic of any detention facility. The Court explained:

> [P]rison administrators are to take all necessary steps to ensure the safety of not only the prison staffs and administrative personnel, but also visitors. They are under an obligation to take reasonable measures to guarantee the safety of the inmates themselves. They must be ever alert to attempts to introduce drugs and other contraband into the premises which, we can judicially notice, is one of the most perplexing problems of prisons today; they must prevent, so far as possible, the flow of illicit weapons into the prison; they must be vigilant to detect escape plots, in which drugs or weapons may be involved, before the schemes materialize.

*Hudson*, 468 U.S. at 526–27. These concerns relate to both pretrial detainees and convicted prisoners. The Court has instructed that "[t]here is no basis for concluding that pretrial detainees pose any lesser security risk than convicted inmates. Indeed, it may be that in certain circumstances they present a greater risk to jail security and order." *Bell*, 441 U.S. at 546 n.28; *see also Florence*, 566 U.S. at 334–37. As a result, the principle of "'mutual accommodation between institutional needs and objectives and the provisions of the Constitution' … applies equally to pretrial detainees and convicted

prisoners." *Bell*, 441 U.S. at 546 (citation omitted). Contrary to the assertion of our dissenting colleague, neither *Bell* nor *Florence* limited its holding solely to pretrial detainees. As stated above, *Bell* expressly assumed that convicted prisoners retain Fourth Amendment rights.

Indeed, many of our sister circuits have concluded that the Fourth Amendment protects a limited right to bodily privacy for convicted prisoners, specifically. *See, e.g.*, *Cookish*, 945 F.2d at 445–46 (concluding the principle that the Fourth Amendment applies to searches of convicted prisoners was well established); *Harris*, 818 F.3d at 58 n.2 ("*Bell* arose in the context of a pretrial detainee strip-search policy, but its framework is equally applicable to convicted inmates challenging isolated searches."); *Parkell*, 833 F.3d at 324–25 (concluding that the *Bell* balancing test applies to a convicted prisoner's Fourth Amendment claim); *Hutchins*, 512 F.3d at 196 (reiterating "that the Fourth and not the Eighth Amendment governs searches of prisoners"); *Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992) (holding that "a convicted prisoner maintains some reasonable expectations of privacy while in prison"); *Michenfelder v. Sumner*, 860 F.2d 328, 331–32 (9th Cir. 1988) (analyzing visual body cavity searches of convicted prisoners for reasonableness); *Fortner*, 983 F.2d at 1030 (recognizing a convicted prisoner's right to bodily privacy under the Fourth Amendment). We are not aware of any decision from another circuit court that has announced this right extinguishes upon conviction.[*]

---

[*] The cases our dissenting colleague cites do not stand for the contrary. *Wallace v. Kato*, 549 U.S. 384 (2007), does not suggest that the Fourth Amendment falls away when an arrestee appears before a magistrate. Rather, *Wallace* held that the statute of limitations for a claim under § 1983

### *1. The Interplay of the Fourth and Eighth Amendments*

Defendants argue that recognizing a Fourth Amendment right to bodily privacy, as we do today, undermines the validity of the Eighth Amendment. Applying the Fourth Amendment to strip searches of convicted inmates, they contend, nullifies the Eighth Amendment's subjective intent requirement by permitting Plaintiffs to prove only the objective unreasonableness of the searches. We conclude that the applicability of the Fourth Amendment does not compromise the heightened standard of the Eighth.

As Defendants concede, constitutional rights can co-exist inside the walls of a prison just as they do outside: prisoners, like all citizens, benefit from the protection of numerous enumerated constitutional rights, and these rights may sometimes overlap. *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 49 (1993) ("We have rejected the view that the applicability of one constitutional amendment pre-empts the guarantees of another."). As the Supreme Court explained in *Soldal v. Cook County*, 506 U.S. 56 (1992), "Where … multiple

---

for a false arrest in violation of the Fourth Amendment begins to run at the time the plaintiff becomes detained pursuant to such process, because that process renders the imprisonment no longer false. *Id.* at 389–92. *McDonough v. Smith*, 139 S. Ct. 2149 (2019), which likewise addressed the accrual of a § 1983 claim, has even less to say on the post-conviction status of the Fourth Amendment. And, in *Manuel v. City of Joliet*, 137 S. Ct. 911 (2017), the Court's only relevant statement—"once a trial has occurred, the Fourth Amendment drops out"—reflected merely that "a person challenging the sufficiency of the evidence to support both a conviction and any ensuing incarceration does so under the Due Process Clause of the Fourteenth Amendment," rather than the Fourth. *Id.* at 920 n.8. The Supreme Court has never announced nor implied that conviction destroys the entirety of a prisoner's Fourth Amendment rights.

violations are alleged," courts do not search for "the claim's 'dominant' character" and limit their inquiry to one body of constitutional law. *Id.* at 70. Instead, they "examine each constitutional provision in turn." *Id.* True, the Supreme Court has held *unenumerated* rights—such as those arising from the due process clause—do not afford a prisoner greater protection than the Eighth Amendment. *Whitley v. Albers*, 475 U.S. 312, 327 (1986). But this conclusion is specific to the Court's substantive due process jurisprudence—claims "covered by a specific constitutional provision, such as the Fourth or Eighth Amendment … must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997); *see also Graham v. Connor*, 490 U.S. 386, 395 (1989) ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.").

Accordingly, in several circumstances, the Court has deemed that other, enumerated constitutional rights afford prisoners certain protections alongside the Eighth Amendment safeguards against cruel and unusual punishment. *See, e.g., Wolff*, 418 U.S. at 555–56 (recognizing due process rights as applied to discipline received in prison); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348–50 (1987) (recognizing First Amendment right to freedom of religion in prison); *Lee v. Washington*, 390 U.S. 333, 333 (1968) (per curiam) (recognizing equal protection rights in prison). Similarly, we have previously concluded that the digital rectal search of a prisoner "falls under both the constitutional protections of the Fourth Amendment

and the Eighth Amendment." *Del Raine v. Williford*, 32 F.3d
1024, 1039 (7th Cir. 1994).

Importantly, the Fourth and Eighth Amendments have
different roles to play with respect to bodily searches and pro-
tect different categories of constitutional rights. The Eighth
Amendment safeguards prisoners against the use of searches
that correctional officers subjectively intend as a form of pun-
ishment. *See Whitley*, 475 U.S. at 319–20. Because reasonable-
ness is an objective test, a defendant's subjective state of mind
is irrelevant to a court's Fourth Amendment analysis. *See Gra-
ham*, 490 U.S. at 398 ("[T]he terms 'cruel' and 'punishments'
clearly suggest some inquiry into subjective state of mind,
whereas the term 'unreasonable' does not."). The Fourth
Amendment thus protects prisoners from searches that may
be related to or serve some institutional objective, but where
guards nevertheless perform the searches in an unreasonable
manner, in an unreasonable place, or for an unreasonable pur-
pose. *See Bell*, 441 U.S. at 559. This last consideration is partic-
ularly salient in the case before us: certainly, a court need not
give as much deference to a prison administrator's assess-
ment of the necessity of a training exercise as it does to
measures taken in response to the actual presence of weap-
ons, contraband, or other immediate security concerns.

### 2. Right to Bodily Privacy in Visual Inspections

Although today we announce that convicted prisoners
maintain a right to bodily privacy during visual inspections
of their bodies, we have not always been so clear. In the wake
of *Hudson*, we have taken different, sometimes conflicting, ap-
proaches to addressing the scope of that right. In several
cases, we concluded that the Fourth Amendment protects
some degree of privacy as pertains to bodily searches. *See, e.g.,*

*Peckham v. Wis. Dep't of Corr.*, 141 F.3d 694, 697 (7th Cir. 1998) ("So, does a prison inmate enjoy any protection at all under the Fourth Amendment against unreasonable searches and seizures? … [W]e think the answer is 'yes[.]'"); *Sparks*, 71 F.3d at 260 (concluding that the Fourth Amendment applies to the involuntary catheterization of an inmate); *Del Raine*, 32 F.3d at 1039 (noting that the execution of a digital rectal probe of an inmate for contraband falls "under both the constitutional protections of the Fourth Amendment and the Eighth Amendment"); *Canedy*, 16 F.3d at 185–86 (applying the Fourth Amendment reasonableness test announced in *Bell* to strip searches); *Forbes*, 976 F.2d at 312–13 (concluding that urine tests are searches for Fourth Amendment purposes, and that these searches must be reasonable pursuant to *Bell*). Indeed, in *Canedy*, we explained that *Hudson* foreclosed some but not all of an inmate's Fourth Amendment rights:

> Some diminution of privacy is of course to be expected in prison. *See Hudson v. Palmer*, 468 U.S. 517 (1984) (prisoners are entitled to no reasonable expectation of privacy in their prison cells insuring them of Fourth Amendment protection against unreasonable searches and seizures). Inmates surely do not enjoy the full sweep of constitutional rights afforded other members of society. But even so, those who are convicted of criminal offenses do not surrender all of their constitutional rights.

16 F.3d at 185. We then concluded that body cavity "searches must be conducted in a reasonable manner." *Id.* at 186 (quoting *Bell*, 441 U.S. at 560). And in *Sparks*, we recognized, "Certainly *Hudson* does not establish that the interior of one's body

is as open to invasion as the interior of one's cell." 71 F.3d at 261.

But we have at least one decision pointing in a different direction. In *Johnson*, we broadly announced that *Hudson* held that any Fourth Amendment right to privacy extinguished upon conviction, and we affirmed the dismissal of an inmate's Fourth Amendment claim regarding observation of his naked body on that basis. 69 F.3d at 146, 150. Thus, in *King*, we attempted to reconcile this inconsistency in our case law with a bright-line rule: that prisoners retain an expectation of privacy regarding physical intrusions *into* their bodies—such as during digital rectal probes and forced catheterizations—but not visual inspections of them. 781 F.3d at 899–901.

As our colleague initially explained in his concurrence in *King*, this rule is untenable. 781 F.3d at 901–04 (Hamilton, J., concurring). To begin, it draws no support from Supreme Court precedent. Indeed, the strip searches the Court evaluated using a reasonableness analysis in *Bell* and *Florence* were visual. *Bell*, 441 U.S. at 528; *Florence*, 566 U.S. at 325. No other circuit has announced (nor ever entertained the notion) that the Fourth Amendment reaches only searches that involve a physical intrusion by a searching official. This is for good reason, as searches may be attributed to law enforcement when they do not physically do the searching, but it occurs at their command. *See, e.g.*, *City of Los Angeles v. Patel*, 576 U.S. 409, 420–21 (2015) (describing a demand by officers for hotel owners to produce records as a search); *see also United States v. Pope*, 686 F.3d 1078, 1082 (9th Cir. 2012) ("[A] Fourth Amendment search occurs when police command a person to reveal something in which he would otherwise have a reasonable expectation of privacy *and* that thing or that area is revealed

as a result of the command."). This is consistent with the over-arching focus of the Fourth Amendment reasonableness analysis, which evaluates an individual's expectation of privacy "in *what was searched*," not who did the searching. *United States v. Scott*, 731 F.3d 659, 663 (7th Cir. 2013) (emphasis added). To conclude otherwise promotes a distinction without a difference: whereas a manual body cavity search conducted by a prison official would fall within the domain of the Fourth Amendment, a search in which an officer orders a prisoner to manipulate her own body and merely looks on would avoid review. In light of these considerations, we thus overrule the section of *King* addressing the plaintiff's Fourth Amendment claim and the bright-line rule it announced.

Likewise, we overrule our decision in *Johnson* to the extent it deems the Fourth Amendment inapplicable to visual inspections during bodily searches. That case, like the one we address today, involved visual bodily searches, although of a less intrusive manner: male prisoners raised a Fourth Amendment challenge to female officers routinely and incidentally observing them in various states of undress in their prison cells, showers, and toilets. *Johnson*, 69 F.3d at 145. In *Johnson*, we read *Hudson* as eliminating all rights to privacy under the Fourth Amendment within prisons and thus affirmed the dismissal of the plaintiff's Fourth Amendment claim on that basis. *Id*. at 146, 150. That reasoning does not survive today's holding. We do note, however, that the result in *Johnson* would have been no different under a reasonableness analysis, given the limited nature of the intrusions at issue and the ever-present institutional concerns over safety and security.

### 3. Deference to Prison Administrators

Having determined that the Fourth Amendment governs the searches at issue here, we turn our attention to how courts must perform the resulting reasonableness analysis and the various considerations they should weigh. *Bell*, 441 U.S. at 559. When evaluating reasonableness, in the context of strip searches of prisoners as in others, courts must afford prison administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547; *see also Florence*, 566 U.S. at 328. Thus, "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Bell*, 441 U.S. at 548 (quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974)).

Accordingly, in *Florence*, the Supreme Court noted that "[c]orrectional officials have a significant interest in conducting a thorough search as a standard part of the intake process," and that visual bodily inspections for symbols of gang affiliation and contraband that could create safety and security concerns are generally reasonable. 566 U.S. at 330–34. And in *Bell*, the Court concluded that visual body cavity searches of pretrial detainees after contact visits, absent evidence officials performed the searches in an unreasonable manner, did not violate inmates' Fourth Amendment rights. 441 U.S. at 558–60. Indeed, Plaintiffs concede that prison officials may strip and body cavity search inmates, if the officials conduct those searches in an appropriate manner, because of concerns regarding safety and security. Likewise, incidental

observations of undressed inmates—particularly ones that are infrequent or at a distance—that are inherent to the continuous surveillance necessary in prisons are almost always reasonable. *Cf. Grummett v. Rushen*, 779 F.2d 491, 495 (9th Cir. 1985).

Consistent with the principle of deference to the judgment of prison administrators, several of our sister circuits, after undertaking a reasonableness analysis of prison strip searches, have concluded that these searches do not violate the Fourth Amendment where the level of intrusion does not outweigh the purported justification for the search. *See, e.g., Lewis v. Sec'y of Pub. Safety & Corr.*, 870 F.3d 365, 368–69 (5th Cir. 2017) (upholding as reasonable visual body cavity searches of prisoners returning from work); *Nunez*, 591 F.3d at 1227–28 (upholding a visual body cavity search where the prisoner failed to produce evidence that it was unreasonable); *Franklin*, 883 F.2d at 656–57 (holding that visual body cavity searches that were justified by "legitimate security concerns" did not violate the Fourth Amendment); *Michenfelder*, 860 F.2d at 332–33 (policy of performing visual body cavity searches every time prisoner left or returned to maximum security unit served legitimate penological interest of institutional security); *Elliott v. Lynn*, 38 F.3d 188, 190–92 (5th Cir. 1994) ("en mass" visual body cavity searches in a non-private area were reasonable to effectively respond to a spike in prison violence). The Fourth Amendment can, and must, account for institutional concerns.

As these many decisions demonstrate, though, the fact that institutional concerns significantly diminish the privacy rights of persons in prison does not mean that the Fourth Amendment provides no protection at all. Indeed, the

Supreme Court has applied the Fourth Amendment reasonableness inquiry in other settings where individuals also have "significantly diminished" privacy rights. *See United States v. Knights*, 534 U.S. 112, 118–20 (2001) (applying a reasonableness analysis to the search of a probationer's home, although probationers "do not enjoy the absolute liberty to which every citizen is entitled"); *Samson v. California*, 547 U.S. 843, 850–55 (2006) (considering the weakness of a parolee's privacy interest and the strength of the government's interest in public safety to uphold a suspicionless search of a parolee as reasonable under the Fourth Amendment).

### *4. Reasonableness of the Search*

Finally, although we have concluded that the Fourth Amendment applies to the strip and body cavity searches at issue, this does not mean that Plaintiffs are necessarily entitled to a trial on their Fourth Amendment claim. They still must provide sufficient evidence that the searches were unreasonable, considering "the scope of the particular intrusion[s], the manner in which [they were] conducted, the justification for initiating [them], and the place in which [they were] conducted." *Bell*, 441 U.S. at 559.

Citing security concerns and the need for cadet training, Defendants argue that the searches at issue were reasonable. We do not resolve today, however, whether Plaintiffs have demonstrated a genuine dispute regarding the reasonableness of the searches. Because the district court concluded the Fourth Amendment did not cover the searches at issue here, it did not perform a reasonableness analysis. Indeed, Defendants, in their motion to strike Plaintiffs' response to their motion for summary judgment, conceded that "[t]he nature of the searches and whether they were conducted in the manner

claimed by Plaintiffs are clearly in dispute." On this record, we cannot determine whether the searches were, in fact, reasonable. We thus leave that analysis to the district court to perform in the first instance on remand.

**B. Qualified Immunity**

In the alternative, Defendants argue that we should affirm the district court's judgment on the ground that they are entitled to qualified immunity. They contend that, as of March 2011, it was not clearly established that a visual strip and body cavity search of a prisoner could violate the Fourth Amendment.

Qualified immunity is an affirmative defense that "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Whether a right is clearly established hinges on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Id.* at 244 (quoting *Wilson v. Layne*, 526 U.S. 603, 614 (1999)). A clearly established right is one that is "dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011)). "It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* at 590. The right must be established not as a general proposition but in a

particularized manner so its contours are clear to a reasonable official. *Reichle v. Howards*, 566 U.S. 658, 665 (2012).

As a threshold matter, we must first determine whether this defense is properly before us. Courts generally do not consider issues raised for the first time on appeal. *Singleton v. Wulff*, 428 U.S. 106, 120 (1976); *CNH Indus. Am. LLC v. Jones Lang LaSalle Ams., Inc.*, 882 F.3d 692, 705 (7th Cir. 2018). "The underlying concern is to ensure that the opposing party is not prejudiced by being denied sufficient notice to respond to an argument." *Hernandez v. Cook Cty. Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011). Plaintiffs argue that Defendants waived, or at least forfeited, their qualified immunity defense by failing to raise it at summary judgment before the district court. Defendants concede that they failed to raise the defense in their summary judgment briefs, but they contend that they neither waived nor forfeited the defense because they asserted it in their answer and interrogatory responses.

Because Defendants failed to raise their qualified immunity defense in their summary judgment motion before the district court, and instead raised it for the first time in their appellate brief, they have waived it for purposes of this appeal. *See DeMallory v. Cullen*, 855 F.2d 442, 449 n.4 (7th Cir. 1988) (noting defendants waived the argument that they are entitled to qualified immunity by failing to raise it before the district court). This is true even though Defendants asserted qualified immunity in their answer and interrogatory responses. *See, e.g.*, *Maul v. Constan*, 928 F.2d 784, 786 (7th Cir. 1991) (raising a qualified immunity defense in an answer "is not sufficient to prevent a finding of waiver because the defendants did not preserve the point when they had subsequent opportunity to do so"). We have previously said we

will "not affirm a judgment based on an affirmative defense raised for the first time on appeal." *McDonald v. Adamson*, 840 F.3d 343, 347 (7th Cir. 2016). Accordingly, we will not consider the merits of Defendants' qualified immunity defense at this stage.

Even if we viewed Defendants' invocation of qualified immunity as only forfeited, the outcome is no different. Waiver and forfeiture are distinct legal concepts. *Hamer v. Neighborhood Hous. Servs. of Chi.*, 138 S. Ct. 13, 17 n.1 (2017). Whereas waiver is the "intentional relinquishment or abandonment of a known right," forfeiture is the mere failure to raise a timely argument, due to either inadvertence, neglect, or oversight. *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)); *see also Williams v. Dieball*, 724 F.3d 957, 961 & n.2 (7th Cir. 2013). In the criminal context, the distinction between waiver and forfeiture is critical: while waiver precludes review, forfeiture permits a court to correct an error under a plain error standard. *Olano*, 507 U.S. at 731–35; *see also* Fed. R. Crim. P. 52(b). This distinction between waiver and forfeiture and its relevance have been less clear in the civil context. In past decisions, we have not consistently used forfeiture "as a way to signal whether plain error review applies" in civil cases. *Williams*, 724 F.3d at 961 n.2.

We therefore clarify that "our ability to review for plain error in civil cases is severely constricted," as "a civil litigant 'should be bound by his counsel's actions.'" *SEC v. Yang*, 795 F.3d 674, 679 (7th Cir. 2015) (quoting *Deppe v. Tripp*, 863 F.2d 1356, 1360 (7th Cir. 1988)). Indeed, in civil cases, "we typically will not entertain an argument raised for the first time on appeal, even for the limited purpose of ascertaining whether a plain error occurred." *CNH Indus. Am. LLC*, 882 F.3d at 705.

Plain error review is available in civil cases only in the rare situation where a party can demonstrate that: "(1) exceptional circumstances exist; (2) substantial rights are affected; and (3) a miscarriage of justice will occur if plain error review is not applied." *Thorncreek Apartments III, LLC v. Mick*, 886 F.3d 626, 636 (7th Cir. 2018) (quoting *Willis v. Lepine*, 687 F.3d 826, 839 (7th Cir. 2012)); *see also Packer v. Trs. of Ind. Univ. Sch. of Med.*, 800 F.3d 843, 849 (7th Cir. 2015); *Yang*, 795 F.3d at 679. The determination of what circumstances fit these criteria is solely within our discretion. *Singleton*, 428 U.S. at 121 ("The matter of what question may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases. We announce no general rule.").

Even if Defendants had only forfeited their qualified immunity defense, this case does not present an exceptional circumstance that would warrant its consideration in the first instance on appeal. We do not aim today, however, to provide a comprehensive list of considerations that meet the relevant criteria. It suffices to say that Defendants may still assert the defense in later proceedings on remand, even though they did not properly preserve it in the district court for purposes of this appeal. True, "the most appropriate time to raise the qualified immunity issue is in a motion for summary judgment filed *before* allowing discovery." *Cygnar v. City of Chicago*, 865 F.2d 827, 842 n.16 (7th Cir. 1989) (citing *Walsh v. Mellas*, 837 F.2d 789, 799–800 n.7 (7th Cir. 1988)); *see also Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987). But we have previously recognized that, "[a]lthough the benefit of immunity from suit is effectively lost once the parties go to trial, we allow plaintiffs to use 'qualified immunity' as a defense to liability at any stage in the litigation." *Alvarado v. Picur*, 859 F.2d

448, 451 n.3 (7th Cir. 1988); *see also Behrens v. Pelletier*, 516 U.S. 299, 308–311 (1996) (allowing appeals resolving the question of entitlement to qualified immunity at multiple stages of litigation). Thus, despite their failure to properly preserve the issue for purposes of this appeal, Defendants may still invoke the defense in a later motion before the district court. *See Cygnar*, 865 F.2d at 842 n.16; *see also Oliver v. Roquet*, 858 F.3d 180, 188 (3d Cir. 2017). With the defense still available to Defendants, there is no risk of a miscarriage of justice.

## C. Defendants' Other Arguments

Defendants argue that—if not on the scope of the Fourth Amendment or qualified immunity—we should affirm the judgment of the district court on multiple alternate grounds. We do not reach any of these arguments.

To begin, Defendants argue that Plaintiffs failed to present evidence of physical injury as the PLRA demands they must in order to receive compensatory damages. *See* 42 U.S.C. § 1997e(e). Defendants did not raise this argument below, and therefore have waived it for purposes of this appeal. *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012).

In addition, Defendants raise several other arguments that Plaintiffs are not entitled to the relief they seek, namely, that Plaintiffs lack standing for injunctive relief pursuant to *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), that Plaintiffs are unable to obtain compensatory damages as to Hulett because they brought no individual capacity claims against her, and that Plaintiffs may not receive punitive damages because the jury found for Defendants on their Eighth Amendment claim, which mirrors the standard for punitive damages. Because the district court granted summary judgment on Plaintiffs'

Fourth Amendment claim, it did not assess any of these arguments pertaining to the availability of remedies as to that claim. We thus also leave these issues for the district court's initial determination on remand.

Lastly, Defendants seek decertification of Plaintiffs' damages classes. Defendants did not file a cross-appeal to challenge the district court's class certification decision. As a general rule, an appellee must file a cross-appeal when he seeks to expand his own rights under the district court's judgment or to diminish the rights of the appellant. *United States v. Am. Ry. Express Co.*, 265 U.S. 425, 435 (1924); *Wellpoint, Inc. v. Comm'r of Internal Revenue*, 599 F.3d 641, 649–50 (7th Cir. 2010). As Defendants' challenge to the district court's class certification decision seeks to diminish Plaintiffs' rights, it is outside the scope of our review absent a cross-appeal. *Cf. Weitzenkamp v. Unum Life Ins. Co. of Am.*, 661 F.3d 323, 332 (7th Cir. 2011) ("A cross-appeal is appropriate only if a prevailing party seeks a judgment different from that rendered by the district court. … [C]ross-appeals are not appropriate in routine cases like ours that raise only alternate grounds for affirmance of the judgment and *not an independent issue like the propriety of class certification*." (emphasis added)); *In re FedEx Ground Package Sys., Inc. Emp't Practices Litig.*, 792 F.3d 818, 820 (7th Cir. 2015) (per curiam) (indicating decertification of a class was inappropriate where the opposing party dismissed its cross-appeal on that issue); *Joseph v. Norman's Health Club, Inc.*, 532 F.2d 86, 88 n.2 (8th Cir. 1976) (refusing to reach the question of class certification without a cross-appeal).

### III. Conclusion

"The continuing guarantee of … substantial rights to prison inmates is testimony to a belief that the way a society

treats those who have transgressed against it is evidence of the essential character of that society." *Hudson*, 468 U.S. at 523–24. We hold that the Fourth Amendment right to bodily privacy is one of those rights that the Constitution guarantees, even though in a significantly diminished way, within the walls of a prison. It does not extinguish upon conviction.

The judgment of the district court is therefore REVERSED and REMANDED for the district court to assess in the first instance whether Plaintiffs have demonstrated that an issue of fact exists as to the reasonableness of the strip and body cavity searches in question and for further proceedings consistent with this opinion.

EASTERBROOK, *Circuit Judge*, dissenting. My colleagues are right to say that prisoners are entitled to protection from abusive guards. Misbehaving guards can be and are criminally prosecuted, as the guard was in *J.K.J. v. Polk County*, 960 F.3d 367 (7th Cir. 2020) (en banc), and many prisoners have tort claims. But our plaintiffs invoke the Constitution rather than other sources of law. Constitutional protection for persons serving sentences following convictions comes from the Cruel and Unusual Punishments Clause of the Eighth Amendment, not the Fourth Amendment.

The difference between the two is that liability under the Eighth Amendment depends on showing an intent to punish improperly, not simply on taking an action that a court deems unreasonable. Compare *Farmer v. Brennan*, 511 U.S. 825 (1994) (mental-state component of Eighth Amendment), with *Whren v. United States*, 517 U.S. 806 (1996) (objective standard under Fourth Amendment). Plaintiffs' claim under the Eighth Amendment was submitted to a jury, which found for the defendants. The jury must have concluded that the defendants did not intend to subject them to unjustified humiliation or otherwise punish them in a way not permitted by the judgments of conviction. The jury's verdict should end the case, not open a new battleground in which judges (and perhaps another jury) determine whether the acts were "reasonable." The sort of inquiry that my colleagues allow amounts to the objective component of Eighth Amendment analysis without the subjective component—a sort of Eighth Amendment lite. That is not what the Fourth Amendment is about.

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

violated". It is hard to see how that rule can be applied to convicted prisoners, for the judgment of conviction extinguishes those very rights. Prisoners are removed from their houses, and the jailers obtain custody of their persons; their persons, papers, and effects are under constant supervision. People often describe the Fourth Amendment as a guarantee of privacy, but privacy is incompatible with imprisonment. Guards must be watchful in the cells, in the yards, in the cafeterias, in the showers, and even in the toilets, for violence may be planned or perpetrated in any of those locations. Drugs, weapons, and other contraband may be hidden or distributed there.

*Hudson v. Palmer*, 468 U.S. 517 (1984), rejected a contention that the Fourth Amendment applies within prison walls after a conviction. What it said is worth repetition:

> Notwithstanding our caution in approaching claims that the Fourth Amendment is inapplicable in a given context, we hold that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell. The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions.

> Prisons, by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for anti-social criminal, and often violent, conduct. Inmates have necessarily shown a lapse in ability to control and conform their behavior to the legitimate standards of society by the normal impulses of self-restraint; they have shown an inability to regulate their conduct in a way that reflects either a respect for law or an appreciation of the rights of others. Even a partial survey of the statistics on violent crime in our Nation's prisons illustrates the magnitude of the

problem. During 1981 and the first half of 1982, there were over 120 prisoners murdered by fellow inmates in state and federal prisons. A number of prison personnel were murdered by prisoners during this period. Over 29 riots or similar disturbances were reported in these facilities for the same time frame. And there were over 125 suicides in these institutions. See Prison Violence, 7 Corrections Compendium (Mar. 1983). Additionally, informal statistics from the United States Bureau of Prisons show that in the federal system during 1983, there were 11 inmate homicides, 359 inmate assaults on other inmates, 227 inmate assaults on prison staff, and 10 suicides. There were in the same system in 1981 and 1982 over 750 inmate assaults on other inmates and over 570 inmate assaults on prison personnel.

Within this volatile "community," prison administrators are to take all necessary steps to ensure the safety of not only the prison staffs and administrative personnel, but also visitors. They are under an obligation to take reasonable measures to guarantee the safety of the inmates themselves. They must be ever alert to attempts to introduce drugs and other contraband into the premises which, we can judicially notice, is one of the most perplexing problems of prisons today; they must prevent, so far as possible, the flow of illicit weapons into the prison; they must be vigilant to detect escape plots, in which drugs or weapons may be involved, before the schemes materialize. In addition to these monumental tasks, it is incumbent upon these officials at the same time to maintain as sanitary an environment for the inmates as feasible, given the difficulties of the circumstances.

The administration of a prison, we have said, is "at best an extraordinarily difficult undertaking." *Wolff v. McDonnell*, 418 U.S. [539] at 566 [1974]; *Hewitt v. Helms*, 459 U.S. 460, 467 (1983). But it would be literally impossible to accomplish the prison objectives identified above if inmates retained a right of privacy in their cells. Virtually the only place inmates can conceal weapons, drugs, and other contraband is in their cells. Unfettered access to these cells by prison officials, thus, is imperative if drugs and contraband are to be ferreted out and sanitary surroundings are to be maintained.

468 U.S. at 525–27 (cleaned up). Although the Justices spoke of privacy in cells, everything they said is equally applicable to privacy elsewhere in a prison. Since *Hudson*, none of the Court's other decisions has suggested that the Fourth Amendment applies to *any* aspect of prison life—if the inmate has been convicted.

Pretrial detainees pose a different problem, because persons awaiting trial cannot be punished. Restrictions on their liberty are proper only if essential to custody and institutional order. That is why *Bell v. Wolfish*, 441 U.S. 520 (1979), and *Florence v. Board of Chosen Freeholders*, 566 U.S. 318 (2012), applied to pretrial detainees both the Fourth Amendment and the Due Process Clause of the Fifth and Fourteenth Amendments. Convicted prisoners, however, may be punished; they do not retain the rights of detainees. That's the principal point of *Hudson* and is why the Justices rejected the prisoners' Fourth Amendment claim without thinking that they had modified *Wolfish*.

In recent years the Court has repeatedly addressed the question: How long after arrest does the Fourth Amendment remain applicable? Although some decisions suggested that the Fourth Amendment's protections lapse when an arrested person is presented to a judge, see, e.g., *Wallace v. Kato*, 549 U.S. 384, 389–92 (2007), more recent decisions have drawn the line at conviction. A detainee retains rights under the Fourth Amendment until conviction. See *Manuel v. Joliet*, 137 S. Ct. 911 (2017); *McDonough v. Smith*, 139 S. Ct. 2149 (2019). After that, the Eighth Amendment sets the limits on institutional management.

The judgment of conviction extinguishes privacy interests, though other interests (such as avoiding gratuitous

punishment) remain. If the Fourth Amendment applies to prisoners after convictions, detainees and convicts end up with the same rights. Yet *Wolfish*, *Hudson*, and many other decisions hold that these different categories of prisoners have different rights while in custody.

*Whitley v. Albers*, 475 U.S. 312 (1986), rejects a contention that a prisoner's asserted interest in bodily integrity is covered by a constitutional provision other than the Eighth Amendment. In the course of suppressing a riot, guards shot a prisoner, likely unnecessarily. An excessive-force claim by a free person or a pretrial detainee is assessed under the Fourth Amendment. See *Tennessee v. Garner*, 471 U.S. 1 (1985); *Graham v. Connor*, 490 U.S. 386 (1989); *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). But that is not how *Whitley* approached an excessive-force claim. The Justices applied the Eighth Amendment (I'll return to how *Whitley* understands that provision) and rebuffed an invitation to derive rules from elsewhere, such as the Due Process Clauses. *Whitley* held that the Eighth Amendment supplies the applicable rules for riot-control operations inside prisons—though it took care to observe that this was so because the inmates were not "pretrial detainees or persons enjoying unrestricted liberty" (475 U.S. at 327).

I recognize that *Whitley* considered the Due Process Clauses (deemed inapplicable) and the Eighth Amendment (found controlling) rather than the Fourth Amendment, but that is because even the plaintiff seems to have recognized that, in light of *Hudson*, the Fourth Amendment was off the table. *Whitley* applies the Eighth Amendment, not the Fourth, to a seizure (bullets count as seizures), so the majority's distinction between searches and seizures for intra-prison events

is not compatible with precedent—or with constitutional text, for the Amendment covers both alike.

In explaining how the Eighth Amendment applies, *Whitley* stressed the importance of its mental-state requirement—that is, the need to show that the defendants displayed "obduracy and wantonness" (475 U.S. at 319). They added:

> The infliction of pain in the course of a prison security measure … does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense.

*Ibid*. In other words, "reasonableness" is a bad standard for assessing prison management. That rules out the Fourth Amendment. The Court added:

> Prison administrators … should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline. It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice.

*Id*. at 321–22 (cleaned up).

A reasonableness standard under the Fourth Amendment withholds that deference. It transfers the effective decisions from wardens and other prison managers to judges and juries. My colleagues suggest that a measure of deference could be preserved by making suitable adjustments to the definition of reasonableness, but, aside from the objection to the Judicial

Branch making up constitutional rules as we go along, the problem remains that judges (and jurors) are *not* prison administrators. What an administrator may deem desirable, even necessary, a juror may deem unwarranted. Jurors aren't trained in prison management and do not have to live with the consequences of errors. But administrators must live with those errors. Guards and prisoners may die if judicial second-guessing hampers prison security. Interfering in training exercises—especially in training about how to search for contraband—poses that risk.

My colleagues say that training sessions aren't really prison management at all, so we need not defer. I don't understand this. Earlier this year the court held in *J.K.J.* that training for guards is constitutionally mandatory. Now it turns out that training is so collateral to good management that jurors (acting in the name of reasonableness) can design training programs, and that everything *Whitley* and *many* similar cases have said about the need to give wardens leeway can be put to one side.

Judges must be modest about their ability to manage other institutions; we are generalists, after all, while wardens are specialists. And it is risible to suggest that jurors, asked to evaluate reasonableness, are more likely than wardens to produce appropriate resolution of the conflict between personal and institutional interests. If prisons are to enjoy the scope of discretion that is essential to sound administration, while protecting prisoners from sadistic conduct, the Eighth Amendment is the right tool for the job.